72 U.S. 599 (____)
5 Wall. 599
DE HARO
v.
UNITED STATES.
Supreme Court of United States.

*606 Messrs. M. Blair, F.A. Dick, J.B. Felton, W.M. Stewart, W.M. Evarts, J.S. Black, and T.J. Coffey, for the appellants.
Messrs. Stanbery, A.G., Carlisle, Wills, and Cushing, argued the case very fully, contra.
*622 Mr. Justice DAVIS delivered the opinion of the court.
The case, on account of the large pecuniary value of the land in controversy, has elicited great interest. We have been aided by oral and written arguments of rare ability, and the question of pueblo and mission rights, and the powers of the Mexican governors of California over them, has been much pressed upon our attention.
The construction, however, which we give to the espediente, conceded to be genuine, and on which the plaintiffs must recover, if at all, supersedes the necessity of discussing the remaining questions, which in any other aspect of the case, it would be important to do.
In order to ascertain the proper effect of the espediente as an entire thing, it is necessary to analyze all its parts. And with this analysis, the meaning of it, in our opinion, cannot be mistaken. The petition presented by Francisco *623 and Ramon de Haro, residents of the ex-mission of San Francisco, to Governor Micheltorena, asks for the grant of the potrero, for the purpose of pasturing cattle inherited from their mother, which they were desirous of taming, and had to remove out of the rancho where they then were. The assent of their father was necessary to enable them to solicit the grant, as they were minors, and it was given.
According to the custom of the country, this petition was referred to the secretary of the department to ascertain what was the true state of facts, and report to the governor. The informe, as it is called, or official report of Jimeno, who was then secretary, as it was approved by the governor, and formed the basis of his action, is of material assistance in arriving at the true nature of the right which was subsequently conceded. It is in these words, addressed to the governor: "The mission of San Francisco has no longer any property, and consequently the potrero which is petitioned for is lying unoccupied, as the soliciting parties show by means of a report proceeding from the respective judge; and inasmuch as there are to be assigned to said establishment, its corporation or common lands, I am of opinion, that, in the meanwhile, the parties might occupy the plot of land, by virtue of a provisional license of your excellency, because no prejudice is caused thereby to the community (or) to any private individual."
The significant fact appearing on the face of this document, is, that it ignores the very matter for which the De Haros petitioned. They solicited a grant of the land pertaining to the potrero, but Jimeno, among the most intelligent of Mexican officials, knew, if the mission was secularized, there would remain an incipient pueblo, which might embrace for its common lands, the piece of ground asked for; and, therefore, reported that the grant of it could not be safely conceded, as it might prejudice the rights of the community. But, as the inclosure was vacant, no harm could result to the public, or any private individual, by its temporary occupancy, and as the petitioners wanted very *624 much a place to pasture the cattle, which had fallen to them in right of their deceased mother, he recommended that they be permitted to occupy it, temporarily, and for their security, the governor should issue to them a provisional license. The report was evidently predicated on the belief that the grant of the land would interfere with the rights of the mission or pueblo; but in the meantime, as they were not ascertained, there could be no reasonable objection to the De Haros having the permissive occupation of the tract. It nowhere appears an interest in the land was in any event to be conceded, nor were any promises held out to the De Haros, if the potrero should prove to be outside of the common lands, a title in fee, or any less title should be assured to them. Jimeno recommended nothing more than a provisional license, enabling the parties to occupy the land for the occasion. The question arises, was Micheltorena's decision in conformity with Jimeno's recommendation? The material part of the order or decree of the governor, and which was extended on the same day of the approval of the report, is as follows: "I declare Francisco and Ramon de Haro, empowered to occupy provisionally the piece of land called Potrero de San Francisco to the extent of half a square league." "Librese el correspondiente despacho"  "let the corresponding order or despatch be delivered; let it be duly entered, and let this information be communicated to the person in charge of said establishment." It is very clear that this decree conforms to the recommendations of the report, and that Micheltorena did not intend to confer any greater powers on the De Haros than Jimeno advised.
There are no words used indicating an intention to give a title, or to vary from the position taken in the informe. The document to be issued, is one corresponding to the right conferred, which was to occupy provisionally the potrero. And the despatch which did issue for the protection of the parties, conformed to the terms of the decree, as will sufficiently appear by an examination of its essential provisions. "I have determined," says the governor, "to permit the Messrs. De Haro to occupy the beforementioned pasture *625 ground, subjecting themselves to the limits that shall be prescribed to the establishment of San Francisco."
If language has any meaning, Micheltorena, intended by this instrument to give nothing more than the power to occupy, and even this power was made expressly subject to the paramount claim of the establishment of San Francisco. To permit pasture-ground to be occupied, excludes all idea that a grant of the land was contemplated. There are, absolutely, no words indicating an intention to make a future grant on the happening of any event whatever. But the despatch goes further, and forbids the De Haros to sell or alien it, or do any act prejudicial to the property of the establishment, on penalty "of losing their right to this provisional concession." The prohibition against sale and alienation, by necessary intendment, refers to the right of occupancy, for no other right was to be conceded, and this right was to cease, if the fundamental conditions attached to "the provisional concession," delivered to the De Haros for their protection, were violated. If they were to lose their right to the land, as is contended, why were the words appropriate to a concession of the land, which an inspection of the original document shows were written in it, stricken out, and the phrase "they shall lose their right to this provisional concession," substituted in their stead? It is clear enough, that Jimeno, who was in the habit of writing grants for land, inadvertently pursued the usual form for such grants, but recovering himself, wrote the words appropriate to confer a license to occupy, which he had recommended and the governor approved.
It surely cannot need more evidence to demonstrate that the Mexican officials intended the espediente to be what it is, a mere license to occupy, not permanently, but "in the meantime," until the ejidos were measured. It is impossible to divest the mind of the conviction, that Micheltorena and Jimeno, either believed they had not the power to grant the potrero, or, if they had, the circumstances of the mission forbade its exercise, and conceded a permissive occupation, not of right, but by way of grace and favor.
*626 But, it is said, the occupation thus permitted could ripen into a grant in fee, or some lesser estate, in case the potrero was not included within the admeasurement of the ejidos. Not so, however, for there are in the title-papers no words granting the tract of land, either absolutely or on condition, provisionally or otherwise; nor any words by which any estate or interest in it can be raised by implication. The power conferred, resembles a grant in no particular, but is a bare, naked license, and to be governed by the rules of law applicable to such a power.
But, the authority of the "Toma de Razon" is invoked to bolster up the claim of title, because in the entry of this case, the word "titulo" is used.
It is proper to remark that the nature and effect of an espediente, when it is clearly ascertainable, from contemporaneous and official construction, cannot be defeated by an entry in the Toma de Razon. The office of the Toma de Razon is to support, not destroy the espediente. In this case, however, the entry did not mistake the character of the transaction, for the Spanish word "titulo" does not indicate the measure of the right, interest, or estate of the party. "It means," according to Spanish authority,[*] "the cause in virtue of which anything is possessed, and the instrument by which the right is accredited," and in Spain and Mexico there are a class of titles (titulos), not translative of property. Therefore, Jimeno did not err in characterizing the instrument given to the De Haros as a "titulo," for the word "titulo" is a nomen generalissimum, to be applied as well to title-papers, which convey title, in the usual acceptation of the term, as to those which confer a mere right of occupancy. And the claimants can derive no help from the use of the word "concession," for a distinguished Spanish scholar (Escriche), gives this definition of it: "Whatsoever is granted as favor or reward, as the privileges granted by the prince." As a matter of favor, Micheltorena conceded to the De Haros, the privilege of temporarily occupying the *627 potrero in question. There was no contract to do more, nor the semblance of one.
Without pursuing the subject further, we are satisfied, from a careful examination of this Mexican record, that the only thing conferred, or intended to be conferred, on the De Haros, was a provisional or temporary license of occupation, which the governor was willing should be in writing, instead of by parol, to enable the licensees to enjoy their possession with greater security. And this leads us to a consideration of the law on the subject of licenses. If the license in question has been terminated, there is an end to this case, and it is wholly unnecessary to consider the other questions which have been discussed at the bar.
There is a clear distinction between the effect of a license to enter lands, uncoupled with an interest, and a grant. A grant passes some estate of greater or less degree, must be in writing, and is irrevocable, unless it contains words of revocation; whereas a license is a personal privilege, can be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making if. There are also other incidents attaching to a license. It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it. A sale of the lands by the owner instantly works its revocation, and in no sense is it property descendible to heirs. These are familiar and well-established principles of law, hardly requiring a citation of authorities for their vindication; but if they are needed, they will be found collected in the notes to 2d Hare & Wallace's American Leading Cases, commencing on page 376.[*] We are not aware of any difference between the civil and common law on this subject.
Testing this case by these rules of law, is not the license *628 given by Micheltorena ended? The De Haros died in 1846, while the Mexican government owned California, and with their death the license terminated. As long as they were in full life they had a valid authority to enter upon the potrero and pasture their cattle, but, as the privilege was a personal one, it ceased when they died, and did not extend to their heirs. The continued possession by the father, and those under him, estops no one  certainly not a sovereign power in Mexico or the United States. The representatives of the De Haros could, doubtless, lawfully enter upon the potrero in order to remove the property left there, but their authority extended no further.
It is argued, the license was to last until the ejidos were measured, and therefore is not determinable until that event occurs. This argument has no force, unless it was the intention of Micheltorena to give some interest in the land to the De Haros when the ejidos were assigned, if they did not embrace the potrero; but we have seen that he had no such intention. He promised nothing; he did not say what he would do or not do when the common lands were measured, but told the De Haros, meanwhile, until they are measured, you can occupy the potrero for a pasture-ground for your cattle. This was not a contract on consideration that they and their heirs should have the right of occupancy until the happening of this event. It might never happen; and what was intended as a mere license would be thus converted into a grant. Micheltorena could have lawfully ousted the De Haros from the possession at any time before their death, because the privilege conferred was at all times within his control, and liable to be countermanded.
The De Haros, so to speak, were tenants-at-will, and held at the sufferance of the Mexican authorities. They could not have been deceived as to the nature of the right conferred, for they repaired to Monterey to get the land in full property, and returned to San Francisco with only a provisional license to pasture their cattle on it. The term provisional excludes the idea of permanency; it means something temporary and for the occasion.
*629 It may be true that Micheltorena, when he conceded to the De Haros the privilege of pasturing cattle on the potrero, did not intend to revoke it, if the conditions were observed, until the ejidos were measured, and that it was so understood by them; but this can, in no aspect of the case, alter the relations of the parties to this suit. It was a personal privilege conceded to the De Haros alone, and with their death it ceased. The license itself not only contains no words extending it beyond the lives of the parties, but all the circumstances of the case exclude the idea that the governor intended to pass any interest descendible to heirs.
If this is so, this claim, if presented to the Mexican government, would have been rejected, and is, therefore, not entitled to confirmation, under the act of Congress, against the United States.
In concluding this opinion, we are sorry to have to state that this record is not a clean one. It is tainted with fraud and forgery. When this claim was originally pressed for confirmation, it was on title-papers conveying a grant of the land, which are now withdrawn as being forgeries. If the espediente on which the claim is now rested carried the title to the property, why substitute forged grants? A crime is never committed without an adequate motive, and it is clear that, in the opinion of the party who did it, the genuine espediente fell short of a concession of the potrero in full property.
We are gratified, on a consideration of the evidence, to learn that the young De Haros, during the short period they occupied the potrero, did not mistake the nature of the power conferred on them. They did not add to the value of the land by improvements, and left nothing on it but what could be easily removed and made available to their heirs.
DECREE AFFIRMED.
Mr. Justice FIELD dissented.
NOTES
[*] Escriche.
[*] Or in the last edition (4th), p. 736, notes to Prince v. Case and Rerick v. Kern.  REP.