JENSEN v. HUNTER et al.

No. 19,321; July 11, 1895.

41 Pac. 14.

Waters—Diversion.—Where Suit was Brought by an Upper riparian owner to compel defendant to desist from taking water from a stream, such compulsory abandonment cannot constitute a consideration for an agreement by another owner to allow defendant to divert the water from a point lower on the stream.

Waters—Adverse Possession.—Title to a Ditch Diverting Water from a stream on the land of plaintiff's decedent cannot be claimed by adverse possession by one who, after using the water for

three years, acknowledged decedent's title by offering to pay for a grant thereof.[1]

Waters—Diversion.—An Oral Permission Given to Divert and use water from a stream is a mere license, which is revocable, and does not vest any estate in the land.[2]

APPEAL from Superior Court, San Bernardino County; John L. Campbell, Judge.

Action by Mercedes Jensen, as executrix, against R. B. Hunter and others, to quiet title. Defendants had judgment, and plaintiff appeals. Reversed.

Paris & Allison and H. W. Nesbit for appellant; Goodcell & Leonard and W. A. Purrington for respondents.

HAYNES, C.—Cornelius Jensen died December 12, 1886, seised of the lands described in the complaint, and plaintiff brings this action, as his executrix, to quiet the title of the estate thereto. The only controversy between the parties relates to an alleged water right and right of way for a ditch claimed by defendants over said lands. The court found in favor of defendants, establishing their right to the water and ditch, and plaintiff appeals from the judgment entered thereon, and from an order denying her motion for a new trial.

The water in question rises above plaintiff's land, and flows through it in a natural stream or watercourse. About four years prior to 1882, the water was diverted by one Kelting at a point above plaintiff's land, and conducted by a ditch to his land, which is now owned by the principal defendant, Margaret Scott, who was formerly the wife of said Kelting. The point of diversion was then upon the land of one Evans, who, in 1882, refused to permit Kelting to longer take the

[1] Cited in Ann. Cas. 1912C, 958, in a note on offer to purchase or purchase of outstanding title or interest by person in possession of land as affecting adverse character of possession.

Cited in Logan v. Guichard, 159 Cal. 598, 114 Pac. 991, and there distinguished from a case where the owner of an irrigation ditch, supplied from a creek—the supply point being on another's land—surrendered, at this other's request, all right as riparian owner in the creek except so far as the ditch was concerned, the creek being on this owner's land at another point.

[2] Cited and approved in Bashore v. Mooney, 4 Cal. App. 283, 87 Pac. 556, a suit to quiet title to an irrigation ditch.

water out upon his land. Whether any part of the ditch, as it then existed, was upon plaintiff's land does not clearly appear. Jose Jensen testified that "it might have crossed a corner of our land." Phillippe Martinez and one Quintana were interested in the ditch with Kelting, but they were not made defendants. Whether they have or claim any present interest does not appear. The defendants, other than Mrs. Scott, are tenants and encumbrancers of Mrs. Scott's land, which was formerly owned by Kelting, and neither her land nor that of Martinez or Quintana touch the stream from which the water was taken at any point.

Mrs. Scott's answer alleged ownership of the right to divert the water for use on her land, and the right to maintain and use the dam and ditch, by the adverse use and possession thereof for more than five years; and for a second defense alleged a parol agreement between her grantor, Kelting, and said Cornelius Jensen, whereby said Kelting agreed to abandon his right to divert the water "at said higher point," and to abandon the use of the ditch at that point, and that Jensen, in consideration thereof, promised and agreed that Kelting should have the perpetual right to divert the water at said lower point, and the like right to use and maintain a dam and a ditch extending therefrom across Jensen's land to a point where it would connect with the ditch before that used to convey the water diverted at said higher point; that the new ditch was completed in the spring of 1882, and was used thereafter until 1886, when the dam was washed away, and that Jensen then orally agreed with Mrs. Scott that she should have the perpetual right to maintain a dam at a point about two hundred yards above the site of the one washed out, and to construct a ditch from the new dam to connect with the ditch then existing; that the new dam and ditch were used by Mrs. Scott until June, 1888, when plaintiff prevented the further use of the dam and ditch. The court found all the averments of the answer to be true, except that the court was unable to find or determine the quantity of water to which the defendant was entitled, but found that she was entitled to the flow of the water to the full capacity of the ditch, not to exceed, however, three hundred inches measured under a four-inch pressure, that being the quantity she alleged she was entitled to.

Appellant contends that the findings are not justified by the evidence. The answer, as we have seen, alleged a consideration for the parol agreement alleged to have been made by Jensen with Kelting for the right to construct the dam and ditch on the land of the former. That consideration is alleged to have been the abandonment by Kelting of the right to divert the water at a point above Jensen's land. The evidence, however, shows that about four years before the construction of the dam and ditch on Jensen's land Kelting diverted the water upon the land of one Evans, and that Evans brought suit against Kelting, and compelled him to desist from taking the water, and it was this enforced abandonment of the diversion of the water and use of the former ditch that is referred to as the consideration of Jensen's alleged parol agreement with Kelting. Such enforced abandonment could not constitute a consideration for the alleged agreement. There was, however, no evidence that any promise or agreement was made by Jensen, whether by parol or otherwise, at or before the construction of the dam, conferring upon Kelting a right to the water, or to construct the dam or ditch; nor was there any evidence in support of the allegation that when the dam was washed away in 1886 Jensen orally agreed with Mrs. Scott that she should have the perpetual or any right to maintain a dam or ditch at any place upon his land; but the evidence shows that the first dam and ditch constructed upon Jensen's land was by his license or permission, and that after that dam was washed away another dam was constructed at a different place, and a new ditch taken out and connected with the old one, also with Jensen's permission. That the construction of the dam and ditch was not based upon any assertion of right in Kelting or his associates, Martinez and Quintana, who assisted in their construction and participated in the use of the water, is clear. Neither of them were riparian proprietors, and the place of diversion which they had been compelled to abandon, as well as the water diverted, was the private property of Evans. The particulars of the litigation with Evans do not appear in the record, but it must be assumed from the result that they had no right. If they had purchased the water right from Evans, the right to the ditch across his land would have been sustained; and a right acquired by adverse possession would have been equally efficacious to sustain their right to both the

water and the ditch. If, therefore, they had no right to the water as against Evans, they could have no right to it as against Jensen, and defendants cannot now assert any title to either the water or the ditch, unless it has been acquired by adverse possession, there being not only no evidence of any grant, but both the answer and the evidence on the part of the defendants concede that no conveyance of the right was ever made.

In Pitzman v. Boyce, 111 Mo. 387, 33 Am. St. Rep. 536, 19 S. W. 1104, a case involving a similar question, it was said: "The question to be first determined in this case is whether the use was really adverse to the owner, or was it merely per-missive in its character? If permissive in its inception, then such permissive character, being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character." In Thomas v. England, 71 Cal. 456, 460, 12 Pac. 491, it was said: "To perfect an easement by occupancy for five years, the enjoyment must be adverse, continuous, open, peaceable. It must be adverse, and under claim of legal right so to do, and not by the consent, permission, or indulgence merely of the owner of the alleged servient estate." That the use of the dam, ditch, and water by the defendants was not under a claim of "legal right" is apparent from the testimony of Mrs. Scott, the principal defendant, as well as from the testimony of other witnesses. Mrs. Scott, it is true, testified that she used the water peaceably until about two years before the trial, and during that time claimed it as her own property. She further testified, however, as follows: "I went to Mr. Cornelius Jensen to get him to give me a writing for the right of way, and took money along to pay him for it. He said it was not necessary, the water was mine, and he could not take it, and nobody else, and offered to defend me if I had any trouble with it. This conversation was two or three years before Jensen died." She further testified that she had three or four conversations with him about the water, and that he always said it was hers; that she never had any writing from Mr. Jensen for the right of way; that he said it wasn't necessary, that he gave it to her husband, and she had had it so

long it was hers without any writing. Mrs. Berkmere, a sister of Mrs. Scott, testified that she went with Mrs. Scott to see Mr. Jensen; that they went because they heard other parties were talking of buying the water from Jensen. "We thought we would go to Mr. Jensen, and pay him something to secure this water—not the water, the right of way." Mr. Ferris, a witness called by the defendants, testified to the changes in the location of the dam and ditch; that the dam was put on Jensen's place because Evans had sued them and stopped them; that Jensen said she could take it across his land, so that she would not lose her garden or use of the place. Upon cross-examination he was asked: "Q. Did he say he would simply give permission to run the water through his land? A. Yes, sir; he had let them have a chance to have some water there. I took it from what he said that he should let her have a right of way. I asked him one time why he did not deed it to her if he wanted her to have it, and he said it would be all right. He said Mrs. Kelting had a big family, and he wanted her to have the use of the water, and that he might not want the water for some time. He told me that he would not sell any of that water—that he wanted Mrs. Kelting to have it"; and, in reply to a question whether Jensen did not say that he might need the water himself sometime, answered, "No, sir; he told me he could never use that water on his land, and it was thought so at that time." These conversations testified to by Mr. Frank Ferris took place about 1884. Frank Wilkinson, for defendant, testified that he was with John Berkmere when he tried to get some writings from Jensen giving Mrs. Kelting (now Mrs. Scott) a right of way. That also was in 1884. Phillippe Martinez, called by the plaintiff, testified, in substance, that he was interested in the ditch with Kelting and Quintana; that they went to Jensen and got permission to take out the ditch; that Jensen said he was willing that his neighbors should have the use of the water; that the dam would often break, and he would go and get permission to build another, and to take out a new piece of ditch, but that Jensen never sold or gave the right of way; that in 1886, shortly before Mr. Jensen died, he went to him on behalf of Kelting, Quintana and himself to purchase the right of way for the ditch, and the water right, and offered to give him $1,000 for it; that "Jensen said he did not care about it, as he was about to die, and his heirs would

be left so they could fix his matters.'' Jose Jensen testified that they had been using the water on the Jensen land about two years.

It is a significant fact that the evidence nowhere discloses any effort to secure from Jensen a grant or conveyance of this valuable water right, and the right to construct and maintain upon his land the dam and ditch necessary to its use and enjoyment, until Mrs. Scott learned that others were talking of buying the water from Jensen, two years or more after the dam and ditch were constructed. It is urged by respondent that she had a right to buy in a title to secure herself, and that by doing so she did not waive any right or title she had. But she did not approach Jensen with any assertion of right, but offered to pay him for the conveyance of a right she did not have. It is true she testified that Jensen told her she did not need any writing, that he had given it to her husband, and used other expressions of like character, but the fact remains that the use had continued but two or three years, that unless she could obtain a conveyance of the right she could have no title otherwise than by adverse possession for five years, and her application at that time was a confession of Jensen's title, and that the only source from which she could obtain title was from him. She asserted no right as against him, and, whatever he may have said to her, the fact remains that he refused to convey the right to her. The testimony of Mr. Ferris, already quoted, shows that he only intended her to have the use of the water temporarily, and that that was the reason he did not convey to her the right by deed. His verbal declarations testified to by Mrs. Scott could not vest in her the title to the water, nor the easement of the ditch. In Lovell v. Frost, 44 Cal. 471, it was held ''that the offer to purchase or rent the property, and not merely to purchase an outstanding or adverse claim or title to quiet his possession or protect himself from litigation, as in Cannon v. Stockmon, 36 Cal. 538, 95 Am. Dec. 205, amounted to a clear and unequivocal recognition of the defendant's title. Such recognition proves that the plaintiff's intestate did not, at that time, claim the title as against the defendant, and, the recognition having been given before the full period of the statute had run, the plaintiff is precluded from relying on the statute as vesting in his intestate the title as against the defendant; for in order to secure that position his possession must not only have

been adverse to the defendant, but he must also have claimed the title as against the defendant during the entire statutory period": See, also, Central Pac. R. Co. v. Mead, 63 Cal. 112, and Pacific Mut. Life Ins. Co. v. Stroup, 63 Cal. 150, 154. The elements of adverse possession are very clearly stated in Unger v. Mooney, 63 Cal. 586, 49 Am. Rep. 100, and need not be repeated here; and in De Frieze v. Quint, 94 Cal. 653, 663, 28 Am. St. Rep. 151, 30 Pac. 1, it was said: "The burden of proving all the essential elements of an adverse possession, including its hostile character, is upon the party relying upon it"; but here the use by Kelting and those interested with him, being by the permission and license of Jensen, was in subordination to his title and possession: Brumagim v. Bradshaw, 39 Cal. 24, 37. The facts disclosed by the evidence constituted simply a parol license, founded in personal confidence or favor, and is defined to be an authority to do some act, or a series of acts, on the land of another, without passing any interest in the land: Cook v. Stearns, 11 Mass. 533; Clark v. Glidden, 60 Vt. 702, 15 Atl. 358; Houston v. Laffee, 46 N. H. 505; East Jersey Iron Co. v. Wright, 32 N. J. Eq. 248. Kent thus distinguishes it from an easement: "A claim for an easement must be founded upon grant, or by deed, or writing, or upon prescription which presupposes one, for it is a permanent interest in another's land, with a right at all times to enter and enjoy it; but a license is an authority to do a particular act, or a series of acts, upon another's land, without possessing an estate therein. It is founded in personal confidence, and is not assignable": 3 Comm. 452. It is essentially revocable, and its continuance depends on the will of the person by whom it is given (Bartlett v. Prescott, 41 N. H. 493; Tanner v. Volentine, 75 Ill. 624; Hill v. Hill, 113 Mass. 103, 18 Am. Rep. 455) ; and it is terminated at the death of the party conferring it (Carter v. Page, 4 Ired. 424; De Haro v. United States, 5 Wall. 599, 18 L. Ed. 681). In the case last cited the court (at page 627) said: "There is a clear distinction between the effect of a license to enter lands, uncoupled with an interest, and a grant. A grant passes some estate of greater or less degree, must be in writing, and is irrevocable unless it contains words of revocation; whereas a license is a personal privilege, can be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making it. There are also

other incidents attaching to a license. It is an authority to do a lawful act which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it. A sale of the land by the owner instantly works its revocation, and in no sense is it property descendible to heirs.''

The evidence, showing as it does that the original entry upon Jensen's land in 1882, and the construction of the dam and ditch, and the diversion of the water, were not under a grant, nor upon a claim of right asserted by Kelting and his associates, but under a parol license given by Cornelius Jensen, and that Jensen died in 1886; and, as the license was then terminated, the possession and use by Mrs. Scott may have been adverse from that time; but I see nothing in the evidence justifying the conclusion that prior to that time she had asserted any right or title as against Jensen, who is conclusively shown to have been the owner of the land and water; but, on the contrary, she expressly acknowledged his title in 1884, less than five years before her use of the water and ditch was interrupted by the plaintiff in June, 1888. Where, as here, the evidence clearly shows that the entry and use was under a license merely, convincing evidence of the repudiation of the license, and an unequivocal assertion of a right hostile to the licensor, brought home to him, should be required to set the statute in motion. In the absence of such evidence, a license is a complete answer and defense to a claim of adverse possession or use, set up by the licensee, and some authorities hold that one who enters under a license cannot afterward set up an adverse possession: Luce v. Carley, 24 Wend. (N. Y.) 451, 35 Am. Dec. 637; Blaisdell v. Railroad Co., 51 N. H. 483. A man's title to his land should count for something in controversies of this character.

The judgment and order appealed from should be reversed.

We concur: Searls, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion, the judgment and order appealed from are reversed.