[Civ. No. 4355. Second Appellate District, Division One.—March 31, 1924.]

NORMAN HALL et al., Appellants, v. E. H. WEBB et al., Respondents.

[1] WATERS AND WATER RIGHTS—PERMISSION TO CONSTRUCT DITCH— EFFECT ON RIPARIAN RIGHTS.—A contract between an upper and a lower riparian owner by virtue of which the lower owner is granted permission "to construct and maintain a ditch" over a designated route across the lands of the upper owner, in consideration of which the former agrees to do certain things and to allow the latter certain privileges and immunities, does not give to the lower owner any interest in the riparian rights of the upper owner.

[2] ID.—PERMISSIVE USE—PRESCRIPTION.—The right to acquire water by prescription cannot be acquired by a lower owner on a stream as against an upper riparian owner thereof; and a permissive right of a lower owner to take water from a stream will not ripen into a prescriptive right as against the upper owner granting the permission.

[3] ID.—DIVERSION OF WATERS BY UPPER OWNER.—Where, during the period of time that the lower owner was taking water from the stream by means of the ditch across the lands of the upper owner, the latter diverted the water from said ditch, the effect of such invasion was to prevent the acquisition of a title by prescription in favor of the lower owner.

[4] ID.—RIGHT TO TERMINATE CONTRACT—LESSENING OF WATER SUPPLY — JUDICIAL INQUIRY. — Where a contract granting a lower riparian owner the privilege of constructing and maintaining a ditch across the property of an upper riparian owner provides that if the construction of the ditch shall at any time lessen the water supply of the upper owner, as shown by past experience in the use thereof, of which lessening the upper owner shall have the sole right to determine, then the upper owner shall have the right to terminate the contract, and, after the use of said ditch for a number of years, the upper owner honestly and in good faith determines that his water supply has been lessened and impaired by reason of the construction and maintenance of said ditch, such determination is conclusive of his right to terminate the contract; and it is immaterial that upon judicial inquiry it might be determined by the court, as a matter of fact, that the decision should have been to the contrary.

1. Nature of riparian rights and lands to which they attach, notes, 9 **Ann. Cas.** 1235; **Ann. Cas.** 1913E, 709; **Ann. Cas.** 1915C, 1026. See, also, 27 **R. C. L.** 1069.

2. See 27 **R. C. L.** 1125.

[5] ID. — BREACH BY UPPER OWNER — REMEDIES. — Even though the upper riparian owner breached such contract granting the lower owner the privilege of constructing and maintaining the ditch across the lands of the former, such breach would not give the lower owner any right to take any part of the water belonging to the upper owner, but would merely entitle him, in an appropriate action, to damages for the breach or to relief in permitting the continued use of the ditch.

[6] ID.—PERMISSIVE USER OF WATER—ESTOPPEL TO ASSERT SUPERIOR RIGHTS.—The construction and maintenance of the ditch by the lower riparian owner having been with the express permission and consent of the upper owner, and under an agreement that the latter might terminate the contract at any time he deemed his water supply lessened or impaired, the mere fact that the upper owner permitted the use of the water by the lower owner to continue for a period of eighteen years did not estop the upper owner from asserting his superior riparian rights.

(1) 40 **Cyc.**, p. 744.   (2) 40 **Cyc.**, p. 698.   (3) 40 **Cyc.**, p. 698. (4) 40 **Cyc.**, p. 748.   (5) 40 **Cyc.**, p. 748.   (6) 21 **C. J.**, p. 1150, sec. 154; p. 1152, sec. 155.

APPEAL from a judgment of the Superior Court of San Diego County.   E. A. Luce, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Charles C. Crouch and E. V. Winnek for Appellants.

Wright & McKee for Respondents.

HOUSER, J.—Gathered from the record, the facts of this controversy may be summarized as follows: The plaintiffs (known as the West-enders) are the owners of certain lands riparian to the San Pasqual River.   The defendants are also riparian owners of lands located higher on the said river, and there are yet other owners of land (known as the East-enders) located still nearer the source of the stream.   In 1898 the West-enders brought a suit against the East-enders with reference to the use of the waters of said stream, with a result that a compromise judgment was rendered whereby the use of 2,000 inches of the water of the river was divided between the parties to the suit.   Neither the defendants here nor their predecessor in interest, although owning the land lying between the lands owned respectively by the West-enders and the East-enders in that litigation,

were made parties thereto. The defendants here, instead of drawing their water supply directly from the river, obtained it from a cienaga located upon their land and lying closely adjacent to, and at a lower level than, the river. In 1902, which was several years after the compromise judgment was rendered in the litigation between the West-enders and the East-enders, the West-enders conceived the idea that they could obtain a greater supply of water by connecting directly with the water ditch of the East-enders, rather than by taking the water from the river after it had run in the river-bed, not only past the land belonging to these defendants but for a distance of about three miles in addition thereto, until it had reached a suitable point for its diversion in a ditch leading to the property of plaintiffs. To accomplish this plan it was necessary to obtain the consent of the predecessor in interest of these defendants to the construction of a ditch across his land. Accordingly an agreement was entered into between defendants' predecessor in interest as party of the first part and the West-enders as parties of the second part. The recitals of their contract contained the following: That on the land of the party of the first part was a water supply which had a capacity of furnishing three hundred inches and upward of water for six hours out of every twenty-four hours; that the parties of the second part had a water supply taken from the river after said river left the property of the party of the first part; that the East-enders had a water ditch above the property of the party of the first part, which ditch extended down to the east line of the property of the party of the first part; that the parties of the second part desired to construct a ditch through the land of the party of the first part so that it would connect with the ditch of the East-enders; that the party of the first part desired to grant said permission, provided the construction of said ditch and the taking of said water through it would not in any way affect his said water supply. It was thereupon agreed that the ditch be constructed. The following parts of the agreement are also deemed pertinent to the present controversy:

"And the parties of the second part also agree that they will not at any time put down to bedrock, the diverting dam at Garlock's place, or deepen the structure of the dam below the point at which it is at present constructed.

"And the parties of the second part also agree to always keep said ditch in good repair, and also to keep said dam at Garlock's place in its present condition.

"And the parties of the second part further agree that if the construction of said ditch should in any way lessen said water supply of the party of the first part as shown by past experience in use of said supply, of which the party of the first part, his heirs or assigns, shall have the sole right to determine, then the party of the first part, his heirs or assigns, shall have the right to notify the parties of the second part thereof, and thereupon the rights of the parties of the second part to use said ditch shall cease, and all rights of all parties under this contract shall terminate.

"And the said party of the first part shall have the right to divert from said ditch a sufficient amount of water to irrigate, not exceeding thirty acres of land at any one time, which acreage shall participate with the other acreage of the parties of the second part *pro rata*. . . . And the party of the first part shall also have the right to use a *pro rata* of flood waters which may flow through said ditch."

It was further agreed that the party of the first part should not be liable for any damages caused to the ditch by livestock belonging to the party of the first part. Also, that "the parties of the second part shall have the right to conduct said water in said ditch where the same passes across the San Pasqual River in a submerged flume, but so long as said parties of the second part shall maintain an open ditch or dam to conduct said water across said river, they shall maintain it in such manner that it will not back water or sand to interfere with the reservoir of the party of the first part." The ditch was constructed and for a period of two or three years thereafter was used by the parties to the agreement in accordance with its provisions. The use of the ditch through the land of plaintiff's predecessor in interest, down to the point where it crossed the river, was then abandoned by the West-enders, who at that time, with the consent and permission of the party of the first part to said agreement, took their water supply directly from the river at a point on the land of the party of the first part and near the east boundary thereof.

In 1916 an extraordinary flood occurred, which resulted in filling the cienaga on the land of the party of the first

part with trees, sand, and sediment, which utterly destroyed the cienaga as a source of water. In the month of February, 1920, defendants here served notice on plaintiffs terminating the easement created under the agreement of 1902. During all the time between the date of execution of the agreement and the date of the notice of termination of the easement the defendants had used "from said ditch a sufficient amount of water to irrigate not exceeding thirty acres of land at any one time," as provided by said agreement. After the said notice had been served, plaintiffs brought this action against defendants by which plaintiffs sought to have it adjudged that defendants had no interest in the waters of the said river, nor any right to divert the same, save and except as to surplus water flowing in said stream in excess of the waters acquired by plaintiffs in the compromise judgment in the action between plaintiffs and the West-enders (and to which action defendants were not a party); and to restrain defendants from interfering with plaintiffs' use of said ditch and with their taking of water to the extent and in the manner aforesaid from said stream. Judgment went for defendants, the court thereby declaring that defendants, as owners of the lands described as belonging to them, are "entitled to all the rights of riparian owners in the flow of said stream." From that judgment the plaintiffs appeal.

Although there is no finding by the court on the point, it is clear from the evidence that the water in the cienaga was a part of the water of the river. Whatever water defendants took from the cienaga was the same, so far as riparian rights were concerned, as though the water had been taken directly from the river. (*Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 328 [11 L. R. A. (N. S.) 1062, 88 Pac. 978]; *Los Angeles* v. *Pomeroy,* 124 Cal. 623 [57 Pac. 585]; *Los Angeles* v. *Hunter,* 156 Cal. 607 [105 Pac. 755]; *Montecito Valley Co.* v. *Santa Barbara,* 144 Cal. 588 [77 Pac. 1113].) The question, therefore, is whether or not the contract between the parties had any effect upon the riparian right of defendants to the water in the river; also, whether or not defendants had the power to determine that the construction of the ditch lessened defendants' "water supply." Considering the language of the contract, it purports only in the main to grant permission to plaintiffs to construct a

ditch across the defendants' land. There was no attempt to directly convey to the plaintiffs any interest whatsoever in the "water supply" belonging to defendants' predecessor in interest, either as confined to the cienaga or in his broader riparian right to water in the river. Neither are words used in the contract by which, through even extremely liberal interpretation, such a result would follow. [1] The greatest effect that can be given to the language of the contract is contained in the words of the contract itself, that "the parties of the second part (plaintiffs) may construct and maintain a ditch" over a designated route; in consideration of which right the plaintiffs bound themselves to do certain things and to allow the defendants certain privileges and immunities. In effect, a privilege was extended to the plaintiffs, to be exercised for such a length of time as might be agreeable to the defendants. It must therefore be concluded that, so far as the contract itself is concerned, plaintiffs acquired no interest in defendants' riparian rights.

[2] It is well settled that in circumstances such as are here presented no prescriptive right in the plaintiffs to the use of the water in the river could arise as against the defendants. In the first place, it is obvious that a permissive right such as was enjoyed by the plaintiffs could never ripen into a prescriptive right. Mr. Wiel, in section 587 of volume 1 of his third edition on Water Rights in the Western States, so lays down the rule and supports it by many cases, including *Ball* v. *Kehl*, 95 Cal. 606 [30 Pac. 780], *Jensen* v. *Hunter*, 5 Cal. Unrep. 83 [41 Pac. 14], *Oliver* v. *Burnett*, 10 Cal. App. 403 [102 Pac. 223], and *Davis* v. *Martin*, 157 Cal. 657 [108 Pac. 866]. And in the succeeding paragraph Mr. Wiel also says that "the use must 'substantially interfere' with the property right of the owner; there must be an actual invasion of his property. There must have been such a use of the water, and such damage, as would raise a presumption that complainant would not have submitted to it unless the respondent had acquired the right to so use it. The burden is on the adverse claimant to show such invasion." In the case of *Williams* v. *Costa*, 52 Cal. App. 403 [198 Pac. 1017], where many cases are cited, the principal is laid down that the right to acquire water by prescription cannot be acquired by a lower riparian owner on a stream as against an upper riparian owner thereof. [3]

The facts of the instant case show that on several occasions during the time that the plaintiffs were taking water from the river the defendants diverted the water from the ditch of the plaintiffs to the ditch of the defendants, and the authorities appear to be to the effect that such an invasion will prevent the acquisition of the title by prescription. (*Authors* v. *Bryant,* 22 Nev. 242 [38 Pac. 439]; *Wasatch Irr. Co.* v. *Fulton,* 23 Utah, 466 [65 Pac. 205].) But besides all this, it is expressly admitted by appellants that, in view of the fact that the trial court found against the plaintiffs on the issue of prescription, the point is not urged here, and that "no such question is presented or involved upon this appeal."

[4] Defendants' right to the use of the water in the river being unimpaired, either by virtue of the contract, or because of the permissive use of the water by plaintiffs over a term of years, the remaining question presented to this court has to do with defendants' cancellation of the contract, which involves only the right of plaintiffs either to maintain the ditch as originally constructed, or as later used by its connection with the river proper on the lands of defendants at or near the east boundary thereof. As heretofore stated, the agreement provides that if the construction of the ditch should in any way lessen the water supply of the defendants, as shown by past experience in the use thereof, of which lessening the defendants should have the sole right to determine, then the defendants should have the right to terminate the contract. In this connection, the findings of fact by the trial court were that the flood of 1916 lessened and impaired defendants' water supply, but that said water supply (referring to the cienaga) was in nowise lessened or impaired by any act or acts of the plaintiffs. However, the court further found that the defendants "in good faith determined that the water supply mentioned in the contract of 1902 had been lessened and impaired, and thereupon served the notices upon the plaintiffs set forth in defendants' answer." The effect of such finding is that, although the defendants honestly believed that the construction and the maintenance of the ditch by the plaintiffs had lessened defendants' water supply, as a matter of fact such was not the case. But the "water supply" of the defendants was not limited to the water which they obtained

from the cienaga. Their real water supply included that which was obtained from the cienaga, but the defendants had a much wider and broader right from the river itself. So that if the construction and the maintenance of the ditch on the lands of the defendants near the eastern boundary thereof actually had the effect of lessening defendants' water supply, as applied to the broader riparian rights of the defendants, then the "water supply" referred to in the contract was affected by reason of the plaintiffs' acts.

Considering that the riparian rights of the defendants were in nowise impaired by the terms of the contract of 1902, or by any subsequent act of the parties, the question of whether or not the defendants rightfully terminated the contract becomes merely incidental. If the defendants did not part with any interest in their riparian rights, it is of comparatively small importance whether or not plaintiffs are entitled to maintain a ditch over defendants' land. However, in that connection, appellants contend that the defendants could not capriciously determine that the effect of the construction and the maintenance of the ditch was to lessen their water supply, but that such determination must depend upon facts which caused the defendants to reach such a conclusion, based in this particular instance upon "past experience in the use of said supply." The case falls within the principle governing what are sometimes called "satisfaction contracts." They are divided into two heads: (1) Where the fancy, taste, sensibility, or judgment of the promisor are involved; and (2) where the question is merely one of operative fitness or mechanical utility. As to the first class of cases, the authorities are practically uniform to the effect that the right of the promisor to cancel such a contract may depend entirely upon his whim or his caprice. Relating to the second class of contracts, it is said in 9 Cyc., page 620, in announcing the prevailing rule, that "There is no good reason why in cases of operative fitness or mechanical utility the same principle of law should not be applied. Although the thing to be done may not involve the feelings, taste, sensibility, or personal opinion of the promisor, yet he, in making the contract, may not have been willing to leave his freedom of choice exposed to any contention or subject to any contingency. He is resolved to permit no right in anyone else to judge for him or to

pass on the wisdom or unwisdom, the justice or injustice, of his action. Such is his will. He will not enter into any bargain except upon the condition of reserving the power to do what others might regard as unreasonable. And as there is assuredly no law which prevents a. person from making contracts of this kind if he chooses, the courts should not hesitate to enforce them. . . . Such a contract may be one-sided, in being dependent upon the caprice of one of the parties; it may be an unwise contract to make; but if it is entered into voluntarily, the promisee is bound, and can have no right to ask a court to alter its terms in his favor." Counsel for appellants appear to concede that such is the law. The only contention in that regard is that in this particular case the decision of the defendants to the effect that their water supply was lessened, in order that it bind the plaintiffs, must have been founded upon "past experience in the use of said supply." But the difficulty with that argument is that the contract does not say that the defendants' conclusion in that regard must be logical or correct. The defendants' reasoning may be good, or it may be bad; but in either case it is final. The trial court found that the defendants "in good faith determined that the water supply mentioned in the contract of 1902 had been lessened and impaired"; and so long as defendants in good faith, that is, honestly, reached the conclusion that the construction and the maintenance of the ditch lessened and impaired the water supply of the defendants, it is of no materiality that upon judicial inquiry it might be determined by the court, as a matter of fact, that the decision should have been to the contrary. The language of the contract here is that the defendants "have the sole right to determine" that fact, and if the question is now to be left to anyone else in the world, it injects into the contract something to which the original parties did not agree and to which, in all probability, the defendants' predecessor in interest would not have agreed. It is evident that the intent was that whether the water supply was affected by the acts of the plaintiffs was to be left to the sole determination of the predecessor in interest of the defendants or to his assigns. Having inserted such a provision in their contract, the court cannot now say that it was an unwise provision; that it was injudicious or indiscreet; that it should not have

been agreed to; and therefore adjudged that the plaintiffs should be relieved therefrom. The legal rights of the parties must be ascertained and determined solely according to the provisions of their agreement. It is their contract; they are responsible for it, and they must abide by the consequences. (*Parlin & Orendorff Co.* v. *Greenville,* 127 Fed. 59 [61 C. C. A. 591]; *Wood Machine Co.* v. *Smith,* 50 Mich. 565 [45 Am. Rep. 57, 15 N. W. 906]; *Singerly* v. *Thayer,* 108 Pa. St. 291 [56 Am. Rep. 207, 2 Atl. 230]; *McCarren* v. *McNulty,* 7 Gray (Mass.), 139.)

[5] Even if it should be assumed that the defendants capriciously breached the contract, still such assumption would not help the plaintiffs' case. In an appropriate action the only judgment that the plaintiffs would be entitled to recover would be either damages for such breach, or relief in permitting the plaintiffs to use the ditch for conveying their own water. Certainly because the defendants failed to keep the covenant to which reference has been made would give the plaintiffs no right to take any part of the water belonging to the defendants.

[6] Appellants also urge that the defendants are estopped now to assert their riparian rights because over a course of eighteen years they were silent and permitted the plaintiffs to use the water as against the defendants' superior rights. But, as heretofore shown, the plaintiffs did not by their acts thereby acquire any new or additional rights. Whatever was done was with the acquiescence of the defendants, who were never called upon to disturb the plaintiffs in the exercise of the privilege thus accorded them until, in the judgment of the defendants, the water supply of the defendants was lessened or impaired. The contract was continuous in its nature; it was not limited as to time in any way. Whenever in the judgment of the defendants their water supply was affected by reason of the maintenance of the ditch, the defendants had the sole right to terminate the contract. Mere silence will not work an estoppel, except where the party against whom the estoppel is invoked has stood by and seen the other party infringing upon his rights (*Crisman* v. *Lanterman,* 149 Cal. 655 [117 Am. St. Rep. 167, 87 Pac. 89]); and there never was any infringement here. No adverse claim as against defendants was ever asserted by the plaintiffs. Everything that the

plaintiffs did was with the express or the implied consent of the defendants, and the plaintiffs cannot use such consent as a basis for an estoppel on the ground that the defendants remained silent when it was their duty to speak.

No error appearing, the judgment is affirmed.

Conrey, P. J., and Curtis, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 29, 1924.