[Sac. No. 3600. In Bank.—August 31, 1925.]

## ELMIRA J. WILBUR, Appellant, v. GLEN A. WILBUR et al., Respondents.

[1] APPEAL—FINDINGS—CONFLICTING EVIDENCE—INFERENCES.—The findings of the trial court upon conflicting evidence are conclusive on appeal, and all reasonable inferences are to be indulged in support of the findings; and the burden is upon the appellant who claims error to show its existence, and where two or more inferences may reasonably be deduced from a certain state of facts or circumstances, a reviewing court is not permitted to substitute its deductions for those of the trial court.

[2] PARTNERSHIP—PURCHASE OF INTEREST OF ONE PARTNER BY ANOTHER—SETTLEMENT OF ACCOUNTS—PRESUMPTION.—It is the law of partnerships that when one partner purchases the interest of the other the transaction presumptively includes a final settlement of all partnership indebtedness existing between the partners.

[3] PARENT AND CHILD—DEED FROM PARENT TO CHILD—UNDUE INFLUENCE.—The mere relation of parent and child is not sufficient to invalidate a deed from the former to the latter; it is a circumstance inviting careful consideration to the transaction, but before it can justify the inference of undue influence there must be added imposition, fraud, importunity, or something of that kind; and the mere fact that the conveyance is from parent to child does not change the rule nor render the deed presumptively invalid, but under certain circumstances the burden is upon the grantee to show that the deed from his parent was obtained without fraud or undue influence.

[4] ID.—INDEPENDENT ADVICE.—Where a deed from a mother to her son was found by the court to have been made freely, voluntarily,

---

1. See 2 Cal. Jur. 921, 1009.
3. See 9 Cal. Jur. 233; 20 Cal. Jur. 443; 8 R. C. L. 1034.

and with a full understanding of all the facts and the effect of the transfer, it was not necessary to show that the grantor acted upon independent advice.

---

(1) 4 C. J., p. 775, n. 26, p. 777, n. 60, p. 779, n. 83, p. 883, n. 33. (2) 30 Cyc., p. 736, n. 70 New. (3) 29 Cyc., p. 1657, n. 32, 34. (4) 29 Cyc., p. 1657, n. 33.

APPEAL from a judgment of the Superior Court of Sutter County. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

Keyes & Erskine for Appellant.

Frank McGowan, Blaine McGowan, Lawrence Schillig and A. H. Hewitt for Respondents.

SEAWELL, J.—Mrs. Hazel Wilbur, wife of codefendant Glen A. Wilbur, who was made a party to the suit, appeared and filed her answer in which she disclaimed all right, title, estate, and interest in and to the lands, premises, and personal property or thing involved in the action.

Plaintiff and appellant, Elmira J. Wilbur, is the mother of Glen A. Wilbur, defendant and respondent herein. The real property, the transfer of which it is claimed by the appellant was fraudulently made, as will later appear, and which is the basis of the action, was a part of a larger estate originally acquired by A. H. Wilbur, husband of appellant and father of respondent, deceased since 1898. Besides respondent Glen A. Wilbur there are three other children, issue of said A. H. Wilbur, since deceased, and his said wife, Elmira J. Wilbur, plaintiff and appellant, to wit, Edith Mary Wilbur, Lloyd H. Wilbur, and Elaine May Wilbur. Glen A. Wilbur is the youngest member of the family. The estate or lands in question are situate in Sutter County, some four or five miles northerly from Yuba City. In 1858, that being also the year that A. H. Wilbur and appellant were married, the husband purchased the lands involved in this action, and he and his wife went upon them to reside. Other acreages were thereafter added to the original purchase and the value of the entire estate of A. H. Wilbur at the time of his death—1898—was inventoried at $110,000.

The greater portion of his estate consisted of land. There was some money and bank stock in the estate; the amount thereof is not stated and is not important here. By the decree of distribution one-half of the entire estate was distributed to the widow, appellant herein, and the other one-half was distributed to the four children in equal shares. Presumably by partition proceedings, Edith Wilbur became the owner of the particular parcels which are the subject of this action. On January 29, 1913, Mrs. Elmira J. Wilbur, the mother of said children and appellant herein, and her son, Glen A. Wilbur, respondent, purchased said land from Edith, paying her $40,000 in cash (each paying $20,000) and assumed an existing mortgage thereon in the sum of $18,000. By this purchase each became the owner of an undivided one-half interest therein. The above conveyance also carried with it a transfer of all the personal property on said premises, which consisted of approximately 20,000 raisin trays, 6,000 fruit boxes, cultivating machinery, farming implements, twelve horses and mules, wagons, household furniture, kitchen utensils, men's quarters, pumps and motors and dry-yard cars for carrying raisin trays. The condition and state of preservation of said raisin trays, fruit boxes, machinery, and farming implements and other personal property at the time of sale was considered by the witnesses who testified as to valuations, and that subject will not be treated separately by us inasmuch as the personal and real property was considered together in estimating the value of the premises. The lands, at the time respondent and appellant acquired ownership thereof, were, and since have been, devoted exclusively to the raising of Thompson seedling grapes and the production of prunes, which chops were processed, cured, prepared, and made ready for the market on the premises. Other crops, such as are sometimes planted on orchard or grape lands incidental to the main business, were also occasionally produced in relatively small quantities. It was for the purpose of conducting the premises along the lines of industry above pointed out as a partnership enterprise that the purchase of said premises and personal property was made. The copartnership relation continued from January 29, 1913, to October 22, 1916, on which last-named day respondent purchased from his mother all of her in-

terest of whatsoever kind in and to said real and personal property and the business which they had formerly conducted. Primarily this action was brought to obtain a decree of court canceling and declaring void the deed executed on said 22d of October, 1916, wherein appellant is grantor and respondent grantee, and also to declare void certain agreements and contracts entered into on the same day which may in anywise affect her rights in the premises, for rescission and restoration and for a decree adjudging her to be the owner of an undivided one-half interest in the McKenzie ranch, containing about forty acres, the title to which stands in the name of respondent, but which property, it is claimed, was purchased by partnership funds, and for an accounting and general relief.

The grounds upon which appellant relies as sufficient to sustain her right to have said conveyance set aside and to obtain the other relief sought will appear from the following epitomization of appellant's complaint. It is in four counts. The first count alleges an equal partnership in the premises acquired by the deed of 1913 and that respondent was appellant's agent in selling her portion of the crops raised on said lands during the existence of their copartnership and that plaintiff had the exclusive control and management of said premises and the marketing of said crops; that on October 22, 1916, the day said deed was executed, appellant was of the age of sixty-eight years and then was, and for some time prior thereto had been, in poor health and was highly nervous and greatly weakened in body and mind; that respondent took her to the office of his attorney, Mr. Blaine M'cGowan, and by insistence and coercive and persuasive words, conduct, and methods, overcame her better judgment and induced her to execute the deed of October 22, 1916; that she had no independent counsel or advice whatsoever in the matter nor any opportunity to confer with any person other than respondent and his said attorney; that the reasonable value of said land was then not less than $65,000; that she received the sum of $5,000 and the promissory note of respondent for $20,000 in payment for her property, which note has not been paid. A tender of all moneys received by her on account of the transaction and a refusal by respondent to accept the same is pleaded as of date October, 1917. The allegations of the second

count are substantially to the effect that respondent failed and neglected to render true accounts of the income derived from said lands during the existence of their said ownership and copartnership and represented it to be much less in value than it was in fact and that respondent retained each year a large portion of the share that rightfully belonged to appellant, exceeding in amount $125,000; that respondent was informed as to the income and value of said lands but that she was not informed as to either; that she believed his representations that her interest in said lands would not exceed the value of $25,000, when, as a matter of fact, its true value was in excess of $65,000; that because of her great love and affection for respondent and because of the trust and faith she had in him she believed these and other false representations and acted upon them to her damage. A tender of all she received from respondent in said transaction and a refusal of the latter to accept the same, made prior to the commencement of the action, is alleged. The allegation of count three is that no accounting had ever been made by respondent to appellant and she prays that he be compelled to render a report and account. By count four it is alleged that the respondent purchased with partnership funds the premises known as the McKenzie ranch and holds the legal title in himself. Appellant claims that she is the owner of an undivided one-half interest therein and prays for an order directing respondent to convey said interest to her.

The fraudulent acts and conduct alleged to have been resorted to by respondent as a means of inducing or procuring the execution of the deed dated October 22, 1916, or the employment of any false or fraudulent representations made by him as to any matter or thing relating to the transactions as unduly affecting or influencing the action or conduct of appellant as alleged in the several counts of the complaint, whether said misrepresentations or wrongful acts or conduct be charged as suppressions or concealments of existing facts about which appellant was entitled to be informed, or whether said wrongful acts or conduct are alleged to consist in the employment of persuasion, solicitation or deceit with a purpose of overreaching appellant, who, it is claimed, was infirm in mind and body, are specifically and separately denied. It is affirmatively alleged in the

answer that appellant was under no physical, mental, or legal disability and was not ill or infirm in mind or body at any time during the full period covered by the transactions described in the complaint, and that no undue or unfair advantage was taken of her in any manner or at any time, but that she acted in each instance freely, voluntarily, knowingly, and advisedly.

In addition to the aforementioned specific denials the offer to rescind is challenged as to the promptness with which it was made and as to the sufficiency of the amount of money offered in restoration of the moneys paid out by respondent (pursuant to the agreement of the parties) in liquidation of claims aggregating a very large indebtedness against the partnership business, including taxes amounting to about $800 and a mortgage encumbrance amounting to approximately $12,229.58. It is not pretended by appellant that a tender was made purporting to cover the payments of said outstanding indebtedness, taxes, and encumberances, as a court of equity, it is claimed, in the circumstances of the instant case, will excuse a tender. The bar of the statute, section 338, subdivision 4 of the Code of Civil Procedure, is pleaded against each count or cause of action. It is further urged as a bar to this action that a judgment of dismissal was made and entered in the Superior Court in and for the County of Sutter on November 24, 1919, in an action commenced in that court on November 20, 1917, and it is alleged that the grounds which constituted the cause of action in that case are the same grounds relied upon to constitute a cause of action in the instant case, demanding the same relief and between the same parties. It is admitted by the answer that respondent and appellant were owners as tenants in common of the land conveyed to them by deed dated January 29, 1913, and were copartners in the business of raising grapes and fruits until October 22, 1916, on which day the copartnership was terminated. It is alleged by way of answer that the ownership by them of said lands as tenants in common was voluntarily terminated November 27, 1914, by an instrument executed by respondent and appellant whereby their respective tenures were converted into a joint tenancy with the right of survivorship.

The trial court found against appellant and in favor of respondent upon every material issue made by the pleadings

or presented at the trial. The appeal is before us upon a bill of exceptions, the sufficiency and completeness of which is open to the serious objections made to it by respondent upon several specified grounds. The record is brought here in piecemeal fashion, portions of it being printed and other portions being typewritten, and it lacks orderly and convenient arrangement. Nevertheless, we have taken the pains to examine it. The fact that the appellant is represented to be in an impecunious position has inclined us not to regard too critically the objections made by respondent as to the deficiencies in appellant's specifications of the insufficiency of the evidence to support the findings. We repeat, however, that the record comes dangerously near being vulnerable to the objections made as to its insufficiency and incompleteness.

[1] The findings of the trial court upon conflicting evidence are conclusive, and all reasonable inferences are to be indulged in support of the findings (*Treadwell* v. *Nickel,* 194 Cal. 243, 261 [228 Pac. 25]). The burden is upon appellant who claims error to show its existence (Hayne on New Trial and Appeal, Rev. ed., sec. 285, p. 1574, and cases cited). Where two or more inferences may reasonably be deduced from a certain state of facts or circumstances, a reviewing court is not permitted to substitute its deductions for those of the trial court.

The present action was commenced March 20, 1920, three years and a few months after the execution of the deed which is here attempted to be set aside on the ground that it was fraudulently obtained. We will refer briefly to that portion of the evidence in the case which supports the findings of the trial court.

Appellant had been familiar with and resided upon the premises in question since 1858; she had assisted in planting them to vines and trees, and had farmed and cultivated them generally. She also had a personal knowledge of the quality of the soil and the uses to which it was best adapted and was at all times informed as to the value of said land and of land values in that vicinity generally. The evidence indicates that Mrs. Wilbur was at all times an active and rather keen-sighted woman with progressive and speculative tendencies. Many years of her life were spent at the Wilbur home in Sutter County. In about 1910 she took up her residence in

San Francisco, but kept herself informed by visits to the farm, correspondence, and through other channels of information, as to the management of the ranch and the conduct of the business in connection therewith. Her son, Glen, it seems to be conceded, was a hard-working, economical young man who was unusually attentive to the business of the partnership enterprise and had, according to numerous letters written by the mother, made many personal sacrifices and endured hardships uncomplainingly to the end that the enterprise might become a profitable investment. He not only carried the burden of husbandry, but it also devolved upon him to weather several financial storms. It is true that the mother assisted him by her advice and counsel and upon several occasions advanced money from her own personal estate, but the greater burdens fell upon the son. The mother and son seemed to have been in perfect accord and harmony in all their business relations until she and the daughter Edith became interested in the purchase of a four-story hotel or apartment house situate on Bush Street, in San Francisco. On October 9, 1916, appellant and Edith submitted to one Thomas O'Day an offer to exchange for said Bush Street hotel a list of properties consisting of a forty-acre farm situate in Yolo County, a residence property situate in the city of Santa Cruz, five lots situate in the city of Richmond, and $5,000 in cash or negotiable paper at the rate of seven per cent per annum. The Bush Street property was encumbered with a $30,000 mortgage, which Mrs. Wilbur and her daughter Edith proposed to assume. On the day following said offer Thomas O'Day accepted it in writing. Ten days were reserved by Mrs. Wilbur and her daughter from the day of O'Day's acceptance in which to furnish a marketable title to their properties. This would carry forward the last day for exchange of deeds to October 20, 1916. In contemplation of said exchange of properties, Mrs. Wilbur, on October 19, 1916, demanded of her son that he send her at least $2,000 immediately. This money was to be applied as the agreement of exchange provided. She had earlier in the month received $500 from respondent. The son strenuously opposed the purchase of the hotel by her as thus mortgaged. He felt that she was undertaking a project beyond her strength and ability to handle and eventually she would lose everything and her interest in the

ranch would most likely become entangled and eventually
fall into the hands of persons who might not be acceptable
to him as partners in the business or as tenants in common
in the ownership of the property. Encouraged by her
daughter Edith, the mother insisted that the son meet her
demand, and in the event that he did not, she had resolved
to encumber her interest in the ranch to enable her to com-
plete the purchase. After much discussion on the subject
the mother reduced her demand to $1,250 cash, together with
a request for a deed of the son's interest in a forty-acre
Yolo County farm, which interest was valued at $250. This
demand was complied with. Following the demands of the
mother and her expressed intentions as to the purchase of
the hotel, respondent related the whole matter to his sister
Elaine, who was then at his home, and to Mr. J. W. Eager,
and to his brother Lloyd H. Wilbur, also to Mr. George
Boyd, cashier of the First National Bank of Sutter County,
and expressed to them his misgivings as to the ultimate re-
sult, and advised with them as to what he should do. After
said consultation he decided to go to San Francisco on the
following morning. He then called up Mr. Blaine McGowan
and advised him that he had arrived at the point where he
felt that he would have to sever his business connections
with his mother and that he was coming to San Francisco
prepared to sell his interest. Respondent arrived in San
Francisco at about 12 o'clock, Saturday, October 21, 1919,
and made a number of attempts during the afternoon to
reach his mother by telephone, but failing therein he pro-
ceeded to her residence and found no one at her home. He
visited Mr. Blaine McGowan at his law offices and instructed
him to prepare a deed conveying the mother's interest to
him, and to prepare one or two papers which had the effect,
so it was thought, of converting the title by which the
property was held, to wit, a joint tenancy, back to a tenancy
in common, and to prepare one or two other subsidiary
papers or documents. He made an appointment with Mr.
Blaine McGowan, who was a mutual friend of the family and
who had performed legal services for several members of
the family, including Mrs. Wilbur, to meet him at his office
on the following day, where he would bring his mother and
attempt to close up the transaction which had brought him
to San Francisco. He went to his mother's home in San

Francisco the following morning, arriving at about 8 o'clock. He remained at the home for a short time and invited his mother to ride with him in his automobile. They took up the business that had brought the son to San Francisco and discussed it for several hours. · The mother decided to sell. They then proceeded to Mr. McGowan's office to close the transaction. The proposition submitted by the son was that one should sell to the other at the fixed sum of $25,000, the purchaser to retain all moneys due the partnership and assume all the indebtedness. The transaction was discussed in all of its details by them in private and also in the presence of Mr. McGowan and Mr. Samuels, the notary. The latter was a stranger to all the parties, including Mr. McGowan, and his services were secured simply because he chanced to be accessible. The son was prepared to pay the full amount in cash, but the mother preferred that he should pay $5,000 by check and give a one-year note for $20,000 with interest at the rate of six per cent per annum, payable each and every month thereafter. This being agreeable to the son, the transaction was completed and no dissatisfaction was found with the price or the manner in which the bargain had been consummated until the mother had talked it over with her daughter Edith shortly thereafter and both came to the conclusion that the price was inadequate and the mother had been "cheated." It is quite convincing from the testimony that both Mrs. Wilbur and her daughter Edith had their hearts set upon the purchase of the Bush Street hotel or apartment house. Whatever the son's influence may have been theretofore with his mother in matters of business or otherwise, it is very clear that upon this occasion and in this transaction it was not equal to the task of turning her from her fixed intention of disassociating herself from him in the business in which they were engaged if necessary to attain her purpose, and associating herself with the daughter in the ownership of the hotel property. Doubtless it was the judgment of herself and daughter that a rare opportunity had presented itself which should not be permitted to be lost. That she had greater faith in the hotel property as an investment than she had in the business of grape and fruit raising, there can be but little doubt. Had she heeded the son's advice she would not have disposed of her interest in the ranch to raise money to put into the hotel property,

which investment, it seems, proved to have been an unfortunate exercise of judgment. The respondent did not initiate or encourage the purchase of the latter property, but, it would seem, did everything he reasonably could to prevent it. He was attempting to protect her from financial entanglements as well as himself. While there is a conflict in the evidence as between Mrs. Wilbur on the one hand and Glen Wilbur, Blaine McGowan, and Mr. Samuels on the other hand as to what took place or what was done or said by the respective parties during their negotiations in the law offices of Mr. McGowan and that which preceded said meeting, there is ample evidence to support the court's findings that Mrs. Wilbur was given her choice of purchasing the property for herself at the price of $25,000 or of selling it to her son at the same figure (which amount the court found to be a fair and adequate price), and that she was then and there in full possession of her faculties and had full knowledge of the values of the subject matter of the conveyance and acted freely and voluntarily in said matter and no false or fraudulent representations were made or force or coercion employed to induce or cause her to execute said deed. As against many circumstances and considerable direct evidence which tends to support the court's findings of free and voluntary action on the part of Mrs. Wilbur, her counsel lays stress upon a letter which her son wrote to her two days after said transaction, which it is claimed is self-accusatory in effect and carries with it a consciousness of having taken an unfair advantage of her. The letter in part reads: "My dearest, dearest, dearest mother: I just feel dreadful to-night and have all day to-day for fear you might feel now or might after while feel that I was trying to take advantage of you or did take advantage.

"Mother dear, my heart would just break if you even thought that or felt that way for a single moment. My thoughts are always for your happiness, and I always have an aching heart when I come and see the way you work all the while. . . . " The letter is an isolated circumstance in the transaction and cannot be taken as sufficient to overturn many other circumstances and other evidence which tends to support the court's findings. Considering all the circumstances of the case and the relation of the parties to each other, the letter cannot be said to be open to but the

single construction placed upon it by appellant. It does not in any way indicate an inadequate consideration, but expresses anxiety lest the mother should thereafter, as frequently happens in such matters, be led into the belief that she was not fairly dealt with. The mother, however, expressed no feelings of dissatisfaction at the price she had received for said property until a member of the family thereafter suggested to her that it was not an adequate consideration.

One-half of the entire mortgage encumbrance which rested upon the whole property would reduce the value of Mrs. Wilbur's interest slightly below $25,000. The finding as to adequacy of price cannot, in view of the evidence and the finding of the court, be disturbed. The value of said property was not a subject suddenly thrust upon the mind of Mrs. Wilbur, the consideration of which she had had no previous opportunity or occasion to devote her thought upon. She had known it as a family property for a period of more than fifty years, was thoroughly familiar with its improvements and the productiveness and quality of soil, and had been one of its owners in connection with her son for a period of almost four years immediately prior to the day the deed was executed. Besides, she doubtless considered its market value at the time she was contemplating encumbering it to raise money to enable her to acquire the Bush Street property. That she was not taken by surprise in the transaction is an inference fairly deducible from all the facts and transactions in the case. A number of disinterested witnesses, several of whom had resided in the immediate vicinity for many years, and who, beyond the possibility of doubt, knew the value of the land in controversy, placed Mrs. Wilbur's interest therein, including all personal property, at $31,000. Some of said witnesses had cultivated the soil and had assisted in setting it to vines and trees. If this testimony is to be believed, and the trial court certainly accepted it as true, $25,000 in the clear was a fair market value of the interest of Mrs. Wilbur.

If Mrs. Wilbur was acting freely and voluntarily and under no legal restraint or disability she had the right to make such disposition of her property and at such a figure as she thought the exigencies of her situation required. If the price was reasonably adequate to the value of the prop-

erty and she was acting under no disabilities, but freely and voluntarily and knowingly, as the court found, the question of the accounting would become eliminated from the case.

The price paid by Mrs. Wilbur for the property was $20,-000 and she sold it for $25,000. The report of Accountant Cline, who made a detailed statement of accounts covering the entire period of copartnership, would indicate that Mrs. Wilbur had advanced to the partnership $4,812.90 and had withdrawn therefrom $4,488.20, leaving a balance to her credit on October 16, 1922, of $324.70. Under the management of Glen A. Wilbur, the mortgage of $18,000 was reduced to $12,000. Of this fact Mrs. Wilbur was well aware. A number of the items of the account as prepared by Accountant Cline were attacked as not being proper charges against the partnership, but as being individual charges against the son. A charge of $9,000 made by Glen as salary for services for a period of forty-five months at $200 per month was opposed on the theory that "a partner is not entitled to any compensation for services rendered by him to the partnership," as provided by section 2413 of the Civil Code. There is some evidence to the effect that it was agreed between the parties that the son, who gave his entire time and attention to the cultivation, harvesting, curing, and marketing of crops, while the mother was residing in San Francisco and had no representative to perform her part of said services, was to receive extra or additional compensation. An agreement for additional compensation would not have been unreasonable or unlikely under the circumstances of the case.

What relevancy the controversy as to the salary claim made by the son on account of his services, or the loss suffered by reason of the Roseberg contract, or whether $1,000 of the $5,000 that was paid by the son on the purchase price came from sales of partnership produce or from his private funds, or what relevancy any other disputed item may have to the major question, to wit, whether or not the deed was subject to be canceled for the reasons alleged by appellant, is not apparent. The market value of the land and the fairness of the transaction were the major issues. The market value of the land and the abundances of crops which it yielded were not and could not have been

affected by a misapplication of moneys derived from sales of produce, if such occurred.

The court having found that Mrs. Wilbur was not deceived as to the market value of said premises, but that she acted freely, voluntarily, and knowingly in the matter, renders all other issues made by the pleadings immaterial. Nevertheless the court found against appellant on the contested items of the account.   [2]   It is the law of partnerships that when one partner purchases the interest of the other the transaction presumptively includes a final settlement of all partnership indebtedness existing between the partners. (Bates on Partnership, secs. 629, 630, pp. 664, 665; *Hattenhauer* v. *Adamick,* 70 Ill. App. 602; *Edens* v. *Williams,* 36 Ill. 252.)

It is insistently urged as one of the claims of appellant that there existed an actual relationship of trust and confidence between Mrs. Wilbur and her son and that he acted as her agent in all business matters connected with the partnership.   It is further urged that she acted in the matter alone and without having had the benefit of independent advice.   A number of cases are cited to sustain her position as to these several points.

[3]   It is the well-settled rule of decision of this state that: "The mere relation of parent and child is not sufficient to invalidate a deed from the former to the latter.   It is a circumstance, of course, inviting careful consideration to the transaction, but before it can justify the inference of undue influence there must be added, imposition, fraud, importunity, or something of that kind." (*Broaddus* v. *James,* 13 Cal. App. 464, 472 [110 Pac. 158, 161].)

"The mere fact that the conveyance is from parent to child does not change the rule nor render the deed presumptively invalid. (Pomeroy's Equity Jurisprudence, sec. 962; *Bowdoin College* v. *Merritt,* 75 Fed. 488.)   However, under certain circumstances, the burden is upon the grantee to show that a deed from his parent was obtained without fraud or undue influence.   The doctrine is announced in *Soberanes* v. *Soberanes,* 97 Cal. 145 [31 Pac. 910], through Mr. Justice Paterson, as follows: 'Some of the cases hold that undue influence is not to be inferred from the relation of parent and child where the gift is from the parent to the child (*Millican* v. *Millican,* 24 Tex. 446); but when

the parent is of great age, or is enfeebled by disease, and conveys his entire estate to one child, to the exclusion of other children dependent upon his bounty, the burden is unquestionably upon the donee to show that the gift was made freely and voluntarily and with full knowledge of all the facts and with perfect understanding of the effect of the transfer.' "

"In the case at bar it cannot be said that the grantor was of great age—although she was sixty-four. [Here, she was sixty-eight.] She was, though, somewhat enfeebled by disease, and she conveyed all her property to an only child, to the exclusion, however, of a grandchild. But the evidence seems clear that her mental faculties were unclouded, and there is no question that she understood the effect of a transfer of her property. If we assume that under the peculiar circumstances of the transaction the burden was cast upon the grantee to show that the conveyance was made freely and voluntarily and with the intention to vest the title immediately and irrevocably in him, still we would not be justified in disturbing the judgment of the lower court, because there is sufficient evidence in behalf of respondent's contention to sustain that burden and support the corresponding finding." (*Becker* v. *Schwerdtle,* 6 Cal. App. 462, 464 [92 Pac. 398].)

Likewise in the instant case the court found upon substantial evidence that appellant acted with full knowledge and understanding, and freely and voluntarily in the execution of said deed and was in good physical and mental health, and whatever burden the law may have cast upon the son by reason of a confidential relationship was fully met.

Appellant relies upon *Nobles* v. *Hutton,* 7 Cal. App. 14 [93 Pac. 289], and other cases following the rule applied to certain cases in which cancellations of deeds were directed to be made. All of the cases in which attempted transfers failed contain some ingredient showing undue influence, or menace or mental weakness, or want of full understanding of all the facts and the effect of the transfer, or inadequacy of consideration, or that some species of imposition was practiced. [4] The evidence in this case shows and the court found that the deed was made freely, voluntarily, and with a full understanding of all the facts and the effect of

the transfer. This being so it was not necessary to show that the grantor acted upon independent advice. (*Soberanes* v. *Soberanes,* 97 Cal. 140 [31 Pac. 910].) The facts of a case may so conclusively show that an actor acted advisedly as not to require direct proof of the fact.

In view of what we have already said it becomes unnecessary to discuss the effect of the alleged tender other than to say that there was considerable delay shown in making it and its sufficiency as a tender is questionable.

Having disposed of the case upon its merits it also becomes unnecessary to discuss the bar of the statute and the effect of the judgment of dismissal, both of which were specially pleaded by defendant as heretofore stated.

There is no merit in the objection to the promissory note made upon the ground that it was unsecured. It met with Mrs. Wilbur's approval and no intimation has been made that it was not of the value written upon its face or that its maker was not solvent. In fact, the evidence shows that the note was pledged by her in some undisclosed transaction.

The finding that the McKenzie transaction was a separate affair of the defendant is supported by the evidence.

The record contains much conflicting evidence, and following the rule of decision we have only referred to the portions thereof which have a tendency to support the findings. We are not at liberty to pass judgment upon the credibility of witnesses.

The judgment is affirmed.

Lawlor, Acting C. J., Richards, J., Waste, J., Houser, J., *pro tem.,* and Knight, J., *pro tem.,* concurred.

Rehearing denied.