[Civil No. 2634. Filed February 25, 1929.]

[274 Pac. 1043.]

J. H. MOEUR, as Receiver of THE BANK OF PHOENIX, and T. M. CALDWELL, Appellants, v. FARM BUILDERS CORPORATION, THE ANCHOR TRUST COMPANY OF WICHITA, a Corporation, MARICOPA FARMS COMPANY, a Corporation, and CENTRAL FINANCE CORPORATION, Appellees.

See Appeal and Error, 4 C. J., sec. 2853, p. 879, n. 83, 86.
Assignments, 5 C. J., sec. 80, p. 913, n. 35.
Liens, 37 C. J., sec. 21, p. 318, n. 92.
Mortgages, 42 C. J., sec. 1652, p. 109, n. 17.

Mr. J. Early Craig, for Appellant Moeur.

Mr. Luther P. Spalding and Mr. O. E. Schupp, for Appellant Caldwell.

Messrs. Sloan, Holton, McKesson & Scott and Mr. S. B. Rayburn, for Appellee Anchor Trust Company of Wichita.

LOCKWOOD, C. J.—In 1924, the Anchor Trust Company of Wichita, a corporation, hereinafter called the trust company, brought suit to foreclose a trust deed on certain lands situated near Maricopa, Arizona. At the same time another suit was filed by the same plaintiff to foreclose a trust mortgage on other property in the same locality, and J. H. Moeur, as receiver of the Bank of Phoenix, and T. M. Caldwell, together with certain other parties, were made defendants in both suits.

·The named defendants appeared and answered, alleging they had prior equitable liens on some of the land involved, and thereafter Caldwell brought an independent suit for the purpose of enforcing his lien, naming all the other parties in both suits above mentioned as defendants. Moeur set up his lien by both answer and cross-complaint in this suit. The court rendered judgment in the two suits first named for foreclosure, in accordance with the prayer of the complaints, and in the last named entered judgment against Caldwell on his complaint, and against Moeur on his cross-complaint, and, from each of these judgments, an appeal was taken. Since the questions of fact, the evidence, and the issues of law in that suit will determine the action of this court in all three cases, it was by the parties stipulated and agreed that they should be briefed as one, and the judgment of the court in the one case should be determinative of the other two.

There is little or no dispute as to the evidentiary facts, the argument being over the ultimate facts to be deduced from the evidence, and the conclusions of law flowing from such ultimate facts. Stated briefly, it is the claim of Caldwell and Moeur that the evidence shows they are entitled, the one in his individual, and the other in his representative capacity, to equitable liens on certain of the property covered by the trust deed and mortgage in question, and prior in right thereto by virtue of specific agreements for such liens. This, of course, is denied by the trust company.

The evidentiary facts appear from the record to be as follows: Some time in the year 1921 the legal title to the property in question was in various individuals and corporations, including the Central Finance Corporation, the Maricopa Farms Company, a corporation, and the Maricopa Irrigated Lands

Company, a corporation. It was unproductive and unimproved desert land, and could not be sold in its then condition. On a large part of it was a mortgage in the principal sum of $85,000, secured by a trust deed in favor of the trust company. The remainder was covered by a mortgage in the sum of $8,000, also in favor of the trust company. Certain of the property was also encumbered with a mortgage in the sum of $60,000, originally given to the Maricopa Farms Company, but, at the time mentioned, owned by the Bank of Phoenix and the Central Bank of Wickenburg.

One R. O. Whyman was at this time an officer of the Central Finance Corporation, and of Maricopa Farms Company. He worked out a plan, and presented it to all the interested parties, whereby it was proposed that these particular lands be improved and developed, and put into cultivation. The first step in this plan contemplated the transfer of the legal title of all the land to a new corporation, entitled "the Farm Builders Corporation," which was to undertake the development and sale of the land. The next step was to be the release of the three mortgages above mentioned, and the placing of a first lien mortgage, not to exceed in amount $60 per acre on the land, or a portion of it, for the purpose of raising money to clear and level it and put it into cultivation. The holders of the released mortgages were to accept in lieu thereof trust certificates which were to be junior to the contemplated new mortgage.

In pursuance of this plan releases of the three mortgages were executed and placed in escrow with the Phoenix Title & Trust Company, subject to being taken therefrom on certain conditions set up in the escrow agreement. In November, 1921, Whyman approached Caldwell, who was a contractor and owner of a considerable amount of equipment suitable for

clearing, leveling and putting into cultivation land of this character, and negotiated with him for the preparation of the land in accordance with the plan, the Bank of Phoenix about the same time having agreed to advance $9,000 for preliminary work in connection with the development.

The vital point in the case is the exact nature of the agreements between Caldwell and the bank on the one hand, and Whyman, claiming to represent the Farm Builders Corporation and the trust company, on the other hand. We shall refer to the evidence on this point later on. Caldwell commenced work on the land, and continued for several weeks, being paid by checks drawn on the Bank of Phoenix. Shortly before Christmas, a check given him by the Farm Builders' Corporation, in pursuance of the contract, was refused, the officers of the bank informing him that the releases of the mortgages and the trust deed hereinbefore referred to had not been recorded, and that the bank would not advance any further money until this was done. Caldwell immediately ceased work, and demanded of Whyman that the matter be taken care of, and the latter, after communicating with one Lewis, the first vice-president of the trust company, both by telephone and telegraph, secured an unconditional delivery of the releases from the Phoenix Title & Trust Company, and they were recorded on the 13th of January, 1922.

In the meantime the Farm Builders Corporation on January 2d executed a mortgage in the sum of $72,000 on 1,200 acres of the land being cleared and leveled, and, being the property particularly involved in this case, made in favor of Whyman as an individual. This mortgage was recorded by him on the same date as the releases above referred to. He attempted to use it as collateral for the purpose of borrowing money to pay Caldwell and the Bank of

Phoenix the amounts due them, and to carry on the development and improvement of the land as contemplated. He was unable to secure any money thus, and about the 1st of February, Caldwell made a trip to Los Angeles for the purpose of negotiating a loan for the same purpose with the mortgage as security. He was unsuccessful, and, although he had resumed the work early in January, after the $9,000 which the Bank of Phoenix had agreed to, and did, advance was exhausted, he received no more payments for his labor, and finally stopped work about the 14th of February. He afterwards brought suit against the Farm Builders Corporation for the balance due him, amounting to $8,334.75, with interest from February 14th, 1922, claiming a mechanic's lien on the property, and secured a personal judgment, but his lien was denied. Whyman, having failed to raise any money on the $72,000 mortgage, apparently abandoned any further attempt to carry out his plan of developing the property, and something over a year later executed a satisfaction of the mortgage, and delivered it to the trust company, which satisfaction was duly recorded. About the same time, he executed various warranty deeds, by which the Farm Builders Corporation purported to convey to the trust company the property in question.

It was and is the contention of Caldwell and Moeur that the former agreed to perform the labor above set forth upon the specific representation by the trust company and the Farm Builders Corporation that the prior mortgages had been released, and an agreement that he was to have an equitable lien upon 1,200 acres of land in question for his work, and that the Bank of Phoenix agreed to advance the first $9,000 to be used in paying Caldwell, and the other necessary expenses of preparing the land for sale on the same representations.

The matter was tried by the court sitting without a jury, and, on the vital issues, as to the understanding and agreement in regard to liens, it found as follows:

"The Court finds that the evidence fails to establish any contract, agreement or understanding, express or implied, by or between the Farm Builders Corporation and T. M. Caldwell whereby the said T. M. Caldwell was to have a lien upon the lands described in plaintiff's amended complaint for the sums due or owing under the contract entered into between said parties for the doing of the work mentioned therein, or that the lands described in plaintiff's said amended complaint were to be held as security for the payment of any sums due or owing under said contract. The Court further finds that the evidence fails to establish any contract, agreement or understanding, express or implied, whereby the Bank of Phoenix, otherwise known as the Central Bank of Phoenix, was to have a lien upon the lands described in the cross-complaint of J. H. Moeur, Receiver, for any of the money advanced for the doing of the work and labor upon said lands, or whereby said lands were to be held as security for the payment of any sums of money advanced by said bank. The Court further finds that the evidence fails to establish any agreement, contract or understanding whereby said Anchor Trust Company of Wichita agreed either expressly or by implication that the plaintiff, T. M. Caldwell, should have a lien upon the lands described in plaintiff's amended complaint superior or prior to its said mortgage of $85,000.00. The Court further finds that the evidence fails to establish any contract, agreement or understanding by and between the Anchor Trust Company of Wichita and the Central Bank of Phoenix, otherwise known as the Bank of Phoenix, either in express terms or by implication, whereby the said Bank of Phoenix was to have a lien for moneys advanced prior or superior to the lien of the said The Anchor Trust Company of Wichita by virtue of its mortgage in the sum of $85,000.00."

If this finding stands, the judgment of the trial court in all three cases was unquestionably correct.

If it does not, various other questions will require consideration.

The question of when an equitable lien arises was discussed by this court in the case of *Stephen* v. *Patterson*, 21 Ariz. 308, 188 Pac. 131. Therein we said:

"The intention of the parties to the contract is the thing to be ascertained. This cannot be done by reference to a particular sentence or clause. All the parts must be construed together. . . .

"We recognize the well-settled and familiar principle in equity that where it is clearly shown that the intention of the parties to a transaction is to give a security for a debt or obligation upon some particular property, however informally such intention may be expressed, equity will in an appropriate proceeding declare an equity mortgage or lien to exist, and by its decree enforce the same as against such property in satisfaction of the debt or obligation.

"'Whatever the form of the contract may be, if it is intended thereby to create a security, it is an equitable mortgage.' 1 Jones on Mortgages, par. 162.

"'Courts of equity are not governed by the same rules as courts of law, and generally whenever a transaction resolves itself into a security, or an offer or attempt to pledge land as security for a debt or liability, equity will treat it as a mortgage without regard to the form it may assume.' 27 Cyc. 976.

"'The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form, and if the intent appears to give, or to charge, or to pledge, property real or personal, as a security for an obligation, . . . the lien follows.' 3 Pomeroy's Equity Jurisprudence [3d Ed.], par. 1237.

"'If the transaction resolves itself into a security, whatever may be its form, it is in equity a mortgage.' Story, J., in *Flagg* v. *Mann et al.*, 2 Sumn. 486, 533, Fed. Cas. No. 4847 [and citing cases]."

Counsel for the trust company do not question the general rule of law set forth in the quotation above. It is their contention, however, that it was not the intention of the parties to give a security upon the property in question, but merely that the indebtedness should be paid out of a mortgage to be placed upon the property. It is the law that a promise or agreement to pay out of a particular fund does not give to the promisee an equitable assignment or a lien upon such fund, or the property from which the fund is obtained. *Christmas* v. *Gaines,* 14 Wall. (81 U. S.) 69, 20 L. Ed. 762; *Burke* v. *Child,* 21 Wall. (88 U. S.) 441, 22 L. Ed. 623; *Silent Friend Min. Co.* v. *Abbot,* 7 Colo. App. 73, 42 Pac. 318; *Jennings* v. *Whitney,* 224 Mass. 138, 112 N. E. 655; *Western States Finance Co.* v. *Ruff,* 108 Or. 442, 215 Pac. 501, 216 Pac. 1020; 37 C. J. 318. Nor is this denied by appellants. The question is as to what was the real intention and understanding of the parties.

The burden of proof is of course upon appellants to show the existence of the agreement for the alleged equitable liens by a preponderance of the evidence. The findings of the trial court upon this point are binding upon us if the evidence is such that it reasonably sustains them. *Thomas* v. *Newcomb,* 26 Ariz. 47, 221 Pac. 226; *Blackford* v. *Neaves,* 23 Ariz. 501, 205 Pac. 587; *Pacific Gas & Elec. Co.* v. *Almanzo,* 22 Ariz. 431, 198 Pac. 457.

The strongest evidence in favor of appellants upon this point is the testimony of plaintiff himself, and of E. C. Bradford, who was one of the officers of the Bank of Phoenix at the time the $9,000 was advanced. We quote it as follows, beginning with the testimony of Caldwell:

"And I asked Mr. Whyman, I said, 'What condition is the land in as to title; how will I get my money?' . . . He says, 'We have twelve hundred acres that is

clear, that is at my disposal to use to obtain the money to pay you.' And that he had made arrangements with the Bank to get enough money to start it, to start the work and take care of the payroll, until some of the land was planted and in shape to begin the sales force on it. . . .

"Q. And was anything said at that time and place with reference to the creation of any additional mortgage, or new mortgage upon those lands? . . . A. He said that the releases would give him the twelve hundred acres, that he would use as—to raise funds in order to pay off the work that was being done, and to keep the work under headway until the first unit was in, and his sales force selling the land out in small tracts. . . .

"Q. I will ask you whether or not you would have made or entered into that contract except for the representations Mr. Whyman made to you with reference to clearing all of the liens on that land? A. I would never have entered into it without the promise that the land would be clear where I would be secure to collect for work that I would do. . . .

"Q. . . . In other words, he lead you to believe that the Anchor Trust Company of Wichita, and the Homebuilders were releasing these mortgages in order that this seventy-two thousand dollar mortgage might go in ahead of them, is that right? A. To be used as security to pay off the work, which was an inducement for me to go over there. . . .

"Q. And when you affixed your signature to this contract to do this work you did so because Mr. Whyman had told you that he had the releases, is that right? A. Yes, that I would be protected; that there would be clear property there to realize money on to pay me for my work.

"Q. You were relying upon that statement when you made your contract, is that right? A. I certainly was. . . . After he got the sales force going, but he was going to use the twelve hundred acres to go with, to start with, to start it. He was to use that as security to obtain a loan on which to start on. If you will notice in that contract where it reads that a

unit of three thousand acres, which was marked out—
I would not agree to no acreage, because he might
fall down, as he did, on the payroll. . . .

"Mr. Holton: I have a note here to that effect.
Now, Mr. Caldwell, I am going to ask you to tell us
just what statements it was of Mr. Whyman's that
you relied upon in order—when you attached your
signature to that contract? A. To the soundness of
the contract where I would get my money in which
he stated that he had the releases; approximately
twelve hundred acres whereby he could go and mort-
gage them for sixty dollars an acre, which would take
care of the indebtedness and start the work, but in the
mean time he wanted to get on the work in a few
days which I started on the 19th, two days after the
signing of the contract. He made arrangements with
the Bank to secure enough money to meet the pay-
roll. I don't know how much. I never asked him
anyway. . . . The statement that part of this land
was clear and it would be good security for me to go
ahead. . . . ''

The testimony of Bradford in regard to the $9,000
advanced by the bank was substantially as follows:

"He said he wanted to put in some alfalfa and
stuff to make it look better, because he thought that
by improving it he would have a better opportunity of
financing it, to raise money on that land; and he
wanted the Bank to put up the money for him to pay
Mr. Caldwell, and that he was going to raise money
on a seventy-two thousand dollar mortgage, and he
promised the Bank that out of the first money raised
on this mortgage that the Bank would be reimbursed.
. . . We were to be paid out of the first money raised
on the seventy-two thousand dollar mortgage; and at
one time I know we held up the payroll. . . .

"Q. Now Mr. Bradford, would the Bank ever have
put up this nine thousand dollars or any part of it,
unless it had been represented that this land would be
free and clear to secure the repayment of that sum?
A. Never in a million years, no. They already owed
us too much."

On examining this testimony carefully, we are of the opinion that it is at least ambiguous as to whether it was the intention of the parties that Caldwell and the bank look directly to the land as security for the work done and cash advanced, or whether it was agreed it should be cleared of incumbrance so that Whyman could raise money enough on it to pay them, and that he would do so out of the first proceeds of any mortgage placed upon the land. When from the probative facts either of two opposing inferences may be drawn, the appellate court will not review the one found by the trial court. *Mah See* v. *North American Accident Insurance Co.*, 190 Cal. 421, 26 A. L. R. 123, 213 Pac. 42; *Wilbur* v. *Wilbur,* 197 Cal. 1, 239 Pac. 332; *Reahard* v. *Miller,* 66 Colo. 80, 179 Pac. 157; *Bell* v. *Strong,* 96 Conn. 12, 112 Atl. 645; *Armstrong* v. *Oster,* 189 Ind. 1, 123 N. E. 109; *Thomas* v. *Ball,* 66 Mont. 161, 213 Pac. 597; *Wix* v. *Columbia Mills Co.*, 110 S. C. 377, 96 S. E. 616.

This being true, the finding of the trial court above set forth is not unsustained by the evidence, and, under our familiar rule, we must adopt it as representing the true facts in the case. If there was no agreement out of which an equitable lien would arise, the trial court properly rendered judgment as it did, and the other questions raised need not be considered.

Judgment affirmed.

McALISTER and ROSS, JJ., concur.