[Civil No. 2983. Filed June 16, 1931.]

[300 Pac. 190.]

LOUIS J. CHARLEBOIS, MARTIN N. CHARLEBOIS, FERDINAND A. CHARLEBOIS, ARTHUR J. CHARLEBOIS, GEORGE J. CHARLEBOIS and BLANCHE C. CAVANESS, Appellants, v. MARY RENAUD and SERAPHINE CARTER, as Executrix of the Last Will and Testament of HENRY RENAUD, Deceased, Appellees.

Mr. F. H. Lyman and Mr. Ben L. Rudderow, for Appellants.

Mr. Thomas A. Flynn, Mr. Thomas W. Nealon and Mr. Joseph E. Morrison, for Appellees.

LOCKWOOD, J.—This is an action brought by Louis J., Martin N., Ferdinand A., Arthur J. and George J. Charlebois, and Blanche C. Cavaness, hereinafter called appellants, against Mary Renaud and Seraphine Carter, as executrix of the last will and testament of Henry Renaud, deceased, hereinafter called appellees, for the purpose of impressing a trust on certain property on account of funds alleged to

have been received by Henry and Mary Renaud from the property of the estate of appellants' father. The case was tried before the court sitting without a jury, and judgment was rendered in favor of appellees, and from said judgment this appeal has been taken.

We must assume that, where there is a conflict in the evidence, the trial court took that view of it which would support the findings of fact and judgment. *In re Estate of Schuster,* 35 Ariz. 457, 281 Pac. 38.

And this is binding on us if any reasonable testimony sustains it. *Moeur* v. *Farm Builders' Corp.,* 35 Ariz. 130, 274 Pac. 1043.

Following this rule, we state the facts in the case as follows:

Appellants are all the children of one Joseph Charlebois and the appellee Mary Renaud. Some time prior to 1880 Joseph Charlebois and Mary Lyon were married in the state of Michigan. The family moved to Arizona shortly afterwards, residing first in Pinal county, but about the year 1890 they moved to Maricopa county and established a home on a certain portion of section 36, township 2 north, range 2 east, G. & S. R. B. & M. This township was surveyed and the plat filed in the United States land office December 2, 1870. Charlebois built a frame house, or, as it is commonly called, a shack, resting upon blocks placed on the ground, and the family lived there until Charlebois died in 1891, leaving surviving him his wife, Mary, and six children, the appellants in this case. No other improvements were made by him on the premises. The evidence further was that at one time the Charlebois' owned a few cattle running in the Superstition Mountains. We think, however, it is not necessary to consider these cattle, for it is admitted by counsel for appellants in his brief that the proceeds of the personal property, whatever they might amount to, were used by Mrs. Charlebois in the support of the family before her mar-

riage with Renaud. No administration was ever had on the estate of Charlebois.

In 1893 the widow of Charlebois married Henry Renaud, who thereafter resided with her and appellants upon said tract of land. In 1897 Renaud took a lease upon the premises as occupant thereof under the provisions of chapter 69, Session Laws of Arizona of 1897, and some time subsequent to this he sold and transferred his lease upon the tract to the University of Arizona, and it was for many years used by the University as an experimental farm. The records of the University are very incomplete, and the true price paid by it for the lease is not definitely shown therein, but appellants testify that Renaud and his wife told them many times that the amount received was $4,000.

While Renaud was living upon this land, he purchased certain other land, and shortly after his sale of the lease to the University acquired some other realty. The basis of this suit is the contention by appellants that at the time of his death Charlebois had an inheritable interest in the thirty-one acre tract above referred to; that such interest was taken possession of by Henry Renaud and his wife; that they continued in possession thereof until it was sold to the University of Arizona in 1900; and that the proceeds thereof, amounting to some $4,000, were used by the Renauds in purchasing the realty upon which it is sought to impress a trust.

There are some twenty assignments of error, many of which present very interesting legal questions. We are of the opinion, however, that the only thing which we need consider is the finding of the court "that at the time of the death of Joseph Charlebois he was not seised or possessed of any estate, either in the State of Arizona or elsewhere, of any value whatsoever." If this finding is sustained by the evidence, we need go no further to determine that the judgment should be affirmed. Let us then consider what, if any, right

Joseph Charlebois had at the time of his death in the thirty-one acre tract of land in section 36, *supra.*

Many years before any of the parties mentioned herein appeared upon the scene of action, the Congress of the United States reserved from settlement ''for the purpose of being applied to schools'' in the territory of Arizona sections numbered 16 and 36 in each township thereof. U. S. Rev. Stats., §§ 1946, 1947. It was provided, however, that, where settlements, with a view to pre-emption or homestead, should be made ''before the survey of the lands in the field, which are found to have been made on sections 16 or 36, those sections shall be subject to the claims of such settlers. . . . '' The Supreme Court of the United States, in the case of *Heydenfeldt* v. *Daney Gold & Silver Mining Co.,* 93 U. S. 634, 23 L. Ed. 995, explained the meaning of these provisions as follows:

''Congress said to the people of the Territory, 'You shall, if you decide to come into the Union, have for the use of schools a quantity of land equal to two sections in every township and the identical sections themselves, if on survey no one else has any claim to them; but until this decision is made and the lands surveyed, we reserve the right either to sell them or dispose of them in any other way that commends itself to our judgment.' ''

In other words, settlers on so-called ''school lands'' before survey acquired certain definite rights, both as against the territory and state and against the government of the United States. But, after survey was made, no right whatever in or to said lands could be acquired by mere occupancy of or settlement thereon, in the absence of further legislation either by Congress or the state. *Barkley* v. *United States,* 3 Wash. T. 522, 19 Pac. 36; *United States* v. *Bisel,* 8 Mont. 20, 19 Pac. 251.

No such legislation was ever had by Congress, and it has been the policy of the federal government that,

after a survey of school lands so reserved was made, no rights could be acquired by private parties therein except in pursuance of territorial or state legislation upon the subject.

The lands in question were surveyed in the year 1870. Since Charlebois' settlement thereon was not made till 1890, he acquired no rights whatever thereto under the federal statutes at the time of his settlement. The only legislation adopted by the territory of Arizona and in effect at the time of his settlement in regard to possessory rights on public lands was found in paragraph 2222, Revised Statutes of Arizona of 1887, Civil Code, which reads as follows:

"2222. (Sec. 1.) That all persons who have settled upon and cultivated or improved, or who shall hereafter settle upon, cultivate, or improve a tract of land in this territory, *with the view of availing themselves of the benefit of the pre-emption laws of the United States,* shall be protected in the peaceable and quiet enjoyment of said tract of land, with all the improvements thereon, and all the wood, timber, soil and materials growing or being thereon, to the extent of one hundred and sixty acres, or one half mile square, if unsurveyed according to the cardinal points, and, if surveyed by the United States, then according to the lines of said surveys, so as to include such improvements." (Italics ours.)

It will be seen that these rights apply only to lands which have been settled upon and improved where the settlers have done so "with the view of availing themselves of the benefit of the pre-emption laws of the United States." Since the lands in question were not subject to pre-emption, paragraph 2222 conferred no rights whatever upon Charlebois. *Howard* v. *Perrin,* 8 Ariz. 347, 76 Pac. 460, affirmed 200 U. S. 71, 50 L. Ed. 374, 26 Sup. Ct. Rep. 195.

We are of the opinion that he was either a naked trespasser or, at the most, a mere licensee. In the case of *Merrell* v. *Legrand,* 1 How. (Miss.) 150, dis-

cussing the rights of settlers on public lands, the Supreme Court of that state says:

"There is no law that authorizes or justifies the settlement of individuals on public land; on the contrary, the laws of the United States prohibit it; and however general the practice, such settlers can be considered in no other light than as trespassers. Congress has in several instances, by extending the right of preemption, sanctioned such acts and virtually abolished the rigor of the law, by extending a benefit to the settlers in consequence of an act which was originally illegal; but these are special laws, having reference only to a particular class of individuals, designated by the particular time at which they happened to be in possession. *The general law is unaltered, and it does not appear that the defendant comes within the provision of any particular law which would give color of title or exempt her from the imputation of a trespasser.* The plaintiff purchasing under her could claim no better right; it was therefore an agreement to pay a certain sum of money for the privilege of continuing the trespass." (Italics ours.)

See, also, *Spurlin* v. *Millikin,* 16 La. Ann. 217; *Lindsey* v. *Sellers,* 26 Miss. 169; *Barkley* v. *United States, supra; United States* v. *Bisel, supra.*

If he were a trespasser, there can be no doubt he left no rights in the land which would pass to his heirs. If, on the other hand, it be held he was a licensee, the Supreme Court of the United States, in the case of *De Haro* v. *United States,* 5 Wall. 599, 627, 18 L. Ed. 6£1, discussing the nature of the possession of land by a licensee, says:

"A license is a personal privilege, can be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making it. There are also other incidents attaching to a license. It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of

either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it. A sale of the lands by the owner instantly works its revocation, and *in no sense is it property descendable to heirs.*" (Italics ours.)

Whether we consider Charlebois a licensee or a mere trespasser, it is clear that at the time of his death he possessed no interest of any nature in the land in question which could descend to his heirs.

In 1897 for the first time the legislature of the Territory of Arizona attempted to regulate the use of the reserved school lands. It, of course, at that time had no right to give full title thereto, for Congress had the power to withdraw the reservation at any time up to statehood. *State* v. *Stampfly,* 69 Wash. 368, 125 Pac. 148.

Chapter 69, *supra,* so far as material, reads as follows:

"Section 1. The Boards of Supervisors of the different counties of this Territory are hereby empowered to take control of all University and School lands donated to this Territory for the said purposes, and they are hereby authorized to lease the same in accordance with the provisions of this Act."

"Sec. 4. Actual and *bona fide* settlers or occupants who have placed improvements on School or University Lands, shall have the preferred right to lease the land whereon such settlement has been made. And, provided, further, that where settlers have resided upon, occupied or cultivated any land reserved for this Territory for School or University purposes, prior to the extension of the surveys of the United States over said lands, or who hold the same, or the possession thereof by purchase from the original settlers or their assigns, said original settlers, having resided on said lands or cultivated them prior to the survey of the United States, they shall be permitted to continue to hold said land without lease, until such time as this Territory is admitted as a State into the Union, and the title to said land can be properly ad-

judicated, and the State get other lands for such holdings.''

It will be seen that the only right conferred thereby affecting *surveyed* school lands was the right of the actual and *bona fide* settlers ''who have placed improvements'' thereon to lease the same. The Supreme Court of Arizona, in *Schley* v. *Vail,* 11 Ariz. 226, 95 Pac. 113, in discussing the nature of the improvements required to give a preference right to lease under the statute of 1901, which follows the language of chapter 69, *supra,* says:

''A frame house, firmly constructed, would be a permanent structure, and could be properly termed a 'valuable improvement,' . . . but, if placed on blocks or pillars, as such buildings frequently are, it . . . would not constitute either 'improvements' or 'appurtenances' thereon. . . . ''

We are of the opinion, therefore, that, even if we assume for the sake of argument the extremely doubtful legal proposition that, although Mary Charlebois had married Henry Renaud two years after the death of Charlebois, and four years before chapter 69, *supra,* was adopted, nevertheless, since she was the wife of Charlebois when he first settled upon the land, any lease taken by Renaud and based on the settlement and improvements made by Charlebois inured to the benefit of the heirs of the latter, since no improvements sufficient to comply with the terms of chapter 69 were ever placed upon the land by Charlebois, under no circumstances was any right conferred on his heirs by the statute, and the subsequent lease by Renaud.

We are of the opinion that, upon the facts as they were found to exist by the trial court, Charlebois at the time of his death had no inheritable interest in the land in question which could pass to his children. Such being the case, it is not necessary for us to con-

sider any of the other assignments of error. The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.