Filed 7/3/25  P. v. Bloxton CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B337143 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA018339) |
| v. | |
| DANTE LAVELL BLOXTON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge. Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Dante Lavell Bloxton appeals from the trial court's denial of his petition for resentencing pursuant to Penal Code section 1172.6.[1] The court denied the petition after a full evidentiary hearing, following remand by the appellate court. Finding no error, we affirm.

## BACKGROUND

### I.     Procedural Background

In May 1997, a jury found Bloxton guilty of first degree murder (§ 187, subd. (a)) and four counts of second degree robbery (§ 211). It also found true (i) a robbery-murder special circumstance allegation (§ 190.2, subd. (a)(17)), and (ii) personal use of a firearm (§ 12022.5, subd. (a)) and principal armed with a firearm (§ 12022, subd. (a)(1)) enhancement allegations.

Bloxton was sentenced to life imprisonment without the possibility of parole (LWOP), plus 15 years. Specifically, the trial court sentenced Bloxton to a term of LWOP plus five years for the firearm enhancement on the murder count, and a consecutive term of 10 years for one of the second degree robbery counts (comprised of a base term of five years plus five years for the firearm enhancement). The court stayed or concurrently ran the sentences for the remaining counts.

Bloxton appealed his conviction and we affirmed. (*People v. Bloxton* (July 23, 1998, B113892) [nonpub. opn.].)

In 2018, Bloxton filed a petition under section 1172.6 seeking resentencing for his murder conviction. That

---

[1]     Undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the statute only by its current number for clarity and convenience.

section provides a procedural mechanism for those previously convicted of felony murder, among other things, to seek resentencing. The trial court summarily denied his petition. We affirmed based on the special circumstance true finding. (*People v. Bloxton* (July 29, 2021, B307556) [nonpub. opn.].) However, our Supreme Court granted review and transferred the case back to us for reconsideration in light of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). (*People v. Bloxton*, review granted Oct. 13, 2021, trans. Oct. 19, 2022, S270612.)

After reconsideration, we remanded the case to the trial court based on *Strong*'s holding that findings issued by a jury on special circumstances that predated intervening Supreme Court decisions do not warrant a summary denial of a section 1172.6 petition. Instead, such cases must proceed to an evidentiary hearing. (*People v. Bloxton* (Nov. 10, 2022, B307556) [nonpub. opn.], citing *Strong*, *supra*, 13 Cal.5th at p. 720.)

The trial court held the evidentiary hearing in January 2024. After taking the matter under submission, it denied the petition, finding beyond a reasonable doubt that Bloxton was guilty of first degree murder because he was a major participant in the underlying robbery and acted with reckless indifference to human life.

Bloxton timely appealed. (§ 1237, subd. (b); Cal. Rules of Court, rule 8.308(a).)

## II.  Factual Background

At the evidentiary hearing, the prosecution entered into evidence the record of conviction including the trial transcripts.

3

## A.   Evidence Presented at Trial

Our July 23, 1998 unpublished opinion affirming Bloxton's conviction summarized the evidence as follows:

"[S]hortly before 10 p.m. on August 22, 1993, appellant was one of a group of young Black men who approached Alfredo Bernal and Albert Laracuente as they used public telephones at a Long Beach gas station. Appellant and one of his companions were armed, one with an automatic handgun and the other with a shotgun. Appellant had a white substance on his face.

"The man who held the handgun demanded Bernal's money. After taking his wallet and jewelry, the men moved him to the side of the Bronco he was driving that evening. Bernal's wife, Rosalva Alverez, was dragged from the Bronco by her hair, and her jewelry and money were taken from her.

"As Laracuente walked from the telephones back to the Camaro he was riding in, one of the men pointed a gun at his face. Laracuente, Bernal, Alverez, and another man who had been seated in the Camaro were placed together near the Bronco and forced to empty their pockets. When Laracuente made a comment, he was told he would be shot if he did not 'shut up.' One of the men stated he was going to kill all of the victims because they were Mexican.

"The robbers ransacked the Bronco, looking for additional valuables. Turning to the Camaro, they discovered that a White man, David Hoppes, was sitting in the back seat, and pulled him out. As they started to walk away, one of the men said something about shooting someone. The assailants returned to the victims and began to beat Hoppes. He broke free and ran across the street. One of the men, Efron Bullard, stating he was going to kill Hoppes because he was White, shot him in the leg. Hoppes staggered to the side walk and fell. The assailants followed, and Bullard fired multiple shots into Hoppes' body, killing him.

"Police officers who responded to the scene of the shooting found a number of shell casings and some spent bullets near an apartment building across the street from the gas station. As they gathered these items, two or three women came out of the apartment building and asked questions about the officers' activities and findings. Several months later, Detective Dennis Robbins prepared a photographic lineup containing appellant's photograph. The lineup was shown to Laracuente, who identified appellant's photograph as that of one of the assailants. At trial, Bernal and Alverez identified appellant as a participant in the offenses.

"In a custodial interview conducted on December 8, 1993, appellant stated he and another man, Chris, acted as lookouts for the men who committed the offenses at the gas station. According to appellant, a man named Ed[2] shot Hoppes with a .22 rifle. Appellant stated two others, Stevey, known as 'Spoon,' and a man from Insane were also involved in the robberies. He stated he, Stevey and the other robbers were from the 83rd Street Hoover gang. Appellant's street name was 'Crim,' short for Criminal. He admitted he had acne cream on his face on the night of the shooting, and claimed the shooter also wore acne cream. Appellant stated that following the robberies and shooting, he went into the apartment building and stayed there until two girls, Creole and Young Creole, told him the police had left the area.

"In a second interview conducted on the following day, appellant stated he and his companions sneaked up to the people at the gas station, and he went through their pockets while his

---

**2**    Bullard is sometimes referred to as "Ed." There was no dispute at trial that he had been identified as the shooter, and that Bloxton was not the actual shooter.

companions held the victims at gunpoint. He also participated in the search of the Bronco. Appellant admitted that he and the others pulled Hoppes from the Camaro. He stated that Ed wanted to kill Hoppes because he was White. Appellant admitted that he told Ed, ' "I don't care," ' and then participated in the beating and went through Hoppes' pockets, looking for money. When Hoppes broke free and ran, Stevey chased and caught him. Appellant followed Ed as he crossed the street and shot the victim.

"Appellant identified himself, Ed, Stevey and a member of the Insane Crips as participants on the crimes. He denied that Chris played any part in the incident. Appellant admitted that only he had acne cream on his face, and claimed only Ed had a gun. Following the shooting, he and his companions entered the apartment building.

"On December 10, 1993, the police found wallets and a license plate on the roof of the building. One of the wallets contained Bernal's identification.

"In a third interview conducted on December 12, 1993, appellant identified a photograph of the person he had described as a member of the Insane Crips. He also identified a photograph of Young Creole, and provided the police with information about certain people who lived in the apartment building across from the gas station. He stated again that Ed had said he wanted to kill Hoppes because he was White. Appellant admitted having told Ed he did not care." (*People v. Bloxton, supra*, B113892.)

B. **Additional Evidence Presented at the Evidentiary Hearing**

Bloxton also testified at the January 2024 evidentiary hearing. On direct examination, he testified that the plan was only to rob, not to murder anyone and that he was unarmed. He was asked to join the robbery "five minutes or less" before the

6

robbery occurred. He did not know the actual shooter, Bullard, because he (Bloxton) had just moved to the area. Bloxton was 19 years old at the time of the shooting.

During the robbery, "they"[3] noticed the victim (Hoppes) in the back seat of the Camaro, and when "they" tried to remove him, there was an "immediate struggle" at that point. Bloxton did not hear the actual shooter (Bullard) talk about killing everyone because they were Mexican, and he did not hear anyone talking about killing the passengers who were taken out of the cars. Someone made "threats" toward Hoppes, "because when the struggle happened with Mr. Hoppes, that's simultaneously threats were being made." He testified that when he said "I don't care," "I wasn't referring to I don't care about him dying or anything like that. It was an argument between me and the actual killer at the time, that I wasn't able to articulate when I was—when I was being interrogated." When Hoppes ran, the actual shooter started running, and then Bloxton ran. Before the victim ran, the shooter was saying he wanted to shoot someone, and Bloxton told the shooter, " 'No, don't do it.' " Bloxton testified he was running to try to stop the shooter from shooting, although he also testified that he "didn't even know he was going to shoot the guy."

On cross-examination, Bloxton admitted Bullard said he " 'should' " shoot the White man (Hoppes) and Bloxton responded, " 'I don't care.' " Bloxton did not help Hoppes to get away or render aid after he was shot, instead panicking and running away.

---

[3]  As in *People v. Emanuel* (2025) 17 Cal.5th 867, at times it is not clear what is meant by the use of certain pronouns during Bloxton's testimony at the evidentiary hearing, so we use quotes to avoid possible misinterpretation. (*Id.* at p. 879, fn. 2.)

## C.    Trial Court's Ruling

In denying the petition, the trial court noted that after Bullard told Bloxton that Bullard was going to kill Hoppes, "Bloxton's response conveyed approval." The court found beyond a reasonable doubt that Bloxton was guilty of felony murder as a major participant who acted with reckless indifference to human life. The court ruled that although "the accuracy of Mr. Bloxton's testimony, during the evidentiary hearing, was belied by the record of conviction, the court was moved by Mr. Bloxton's description of his lifelong mental health challenges" and invited him to file a petition for resentencing under section 1172.1.

## DISCUSSION

## I.    Standard of Review

We review the trial judge's fact finding for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) The question when evaluating a special circumstance finding is "whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " (*People v. Clark* (2016) 63 Cal.4th 522, 610 (*Clark*).) The review on appeal is different from the role of the trial court in deciding the section 1172.6 petition in the first instance: "While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements,* at p. 298.)

## II. Evolution of the Major Participant with Reckless Disregard for Human Life Standard

Section 189, subdivision (e) provides that: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] . . . [¶] . . . (3) [t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The language in sections 190.2, subdivision (d) and 189, subdivision (e)(3), derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), which upheld a death sentence against a challenge under the Eighth Amendment to the United States Constitution. (*People v. Estrada* (1995) 11 Cal.4th 568, 575.) The incorporation of *Tison*'s standard in section 190.2 brought California's capital sentencing statutory law into conformity with prevailing Eighth Amendment doctrine. (*Estrada,* at p. 575.)

Subsequently, the California Supreme Court provided substantial guidance on the meaning of the two statutory phrases "major participant" and "reckless indifference to human life." (*People v. Banks* (2015) 61 Cal.4th 788, 801–804 (*Banks*); *Clark, supra,* 63 Cal.4th at p. 616.) It was on the basis of these two decisions that we previously remanded this case to the trial court to conduct the evidentiary hearing at issue here.

In *Banks*, the California Supreme Court explained that "*Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [(*Enmund*)] collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate

a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, 61 Cal.4th at p. 794.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Id.* at p. 802.) And the court explained that Enmund's conduct does not represent the constitutional maximum for death ineligibility; that is, *Enmund* does not represent "the most culpable one can be and yet still be constitutionally ineligible for death, such that *any* variation could move one into the death-eligible zone." (*Banks,* at p. 811.)

We first detail the relevant facts in *Enmund*, as described by the California Supreme Court in *Banks*. Enmund purchased a calf from a man and learned in the process that the seller was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to the seller's house and waited nearby while they entered. When the seller's wife appeared with a gun, the confederates shot and killed both the seller and his wife. Enmund then drove his confederates away from the scene and helped dispose of the murder weapons. (*Banks, supra*, 61 Cal.4th at p. 799.) On these facts, the Supreme Court reversed the death sentence, finding a broad consensus against imposing the death penalty "where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." (*Enmund, supra*, 458 U.S. at p. 795.)

In *Tison*, two brothers helped plan and carry out the escape of two convicted murderers from prison—one of whom, the defendants' father, was serving a life sentence for killing a guard in the course of a previous escape. The brothers brought a cache of weapons to the prison, arming both murderers, and held at

10

gunpoint guards and visitors alike. As part of the ongoing escape, the brothers participated in stopping and capturing "an innocent family whose fate was then entrusted to the known killers [they] had previously armed." (*Tison, supra,* 481 U.S. at p. 151.) The brothers robbed the family and then held them at gunpoint while the two murderers deliberated whether the family should live or die. The brothers then stood by while all four family members were shot. They did not make any effort to help the victims, although they later stated they were surprised by the shooting. (*Id.* at pp. 139–141; *Banks, supra,* 61 Cal.4th at p. 802.)

On these facts, the United States Supreme Court upheld the death penalty for the Tison brothers, holding that the evidence supported a finding of major participation in the felony committed, combined with reckless indifference to human life. (*Tison, supra,* 481 U.S. at p. 158.)

In *Banks,* the court explained that "[w]ith respect to conduct, *Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks, supra,* 61 Cal.4th at p. 802.) The court then provided guidance for future cases, holding: "Among those factors that distinguish the Tisons from Enmund, and thus may play a role in determining whether a defendant's culpability is sufficient to make him death eligible, are these: [(1)] What role did the defendant have in planning the criminal enterprise that led to one or more deaths? [(2)] What role did the defendant have in supplying or using lethal weapons? [(3)] What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? [(4)] Was the defendant present at the scene

11

of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? [and] [(5)] What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Banks*, at p. 803, fn. omitted.)

Considering these factors, the *Banks* court concluded that the evidence placed the nonshooter defendant, Lovie Troy Matthews, at the *Enmund* end of the *Tison-Enmund* spectrum as it related to the "major participation" requirement, acting solely as the getaway driver for an armed robbery. (*Banks, supra*, 61 Cal.4th at pp. 804–805.) The court explained there was no evidence Matthews played any role in planning the robbery; no evidence he procured weapons; no evidence any of the participants had previously committed murder, attempted murder, or any other violent crime; Matthews was absent from the scene of the crime and there was no evidence that he saw or heard the shooting; and he had no immediate role in instigating it, nor could he have prevented it. (*Id.* at p. 805.) The court also found insufficient evidence of "reckless indifference," where "nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death." (*Id.* at p. 807.)

In *Clark*, the California Supreme Court concluded it need not decide whether a nonshooter defendant was a major participant because the evidence was insufficient to uphold a finding that he acted with reckless indifference to human life.

12

(*Clark, supra,* 63 Cal.4th at p. 611.) The *Clark* court noted there was both a subjective and objective element to reckless indifference, quoting Model Penal Code section 2.02, subdivision (2)(c): " 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark,* at p. 617.)

The *Clark* court "set out a nonexhaustive list of considerations relevant to [the reckless indifference standard], including [(1)] use of or awareness of the presence of a weapon or weapons, [(2)] physical presence at the scene and opportunity to restrain confederates or aid victims, [(3)] the duration of the crime, [(4)] knowledge of any threat the confederates might represent, and [(5)] efforts taken to minimize risks." (*Strong, supra,* 13 Cal.5th at p. 706, citing *Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Both *Clark* and *Strong* noted that the "major participant" and "reckless indifference" elements significantly overlap. (*Strong*, at p. 706, *Clark*, at p. 615.)

*Clark* then applied this standard and the factors spelled out in *Banks* and other appellate cases to the facts of the case. First, the prosecution evidence was that there was only one gun at the scene, and Clark was not carrying it. (*Clark, supra*, 63 Cal.4th at pp. 618–619.) Second, Clark was waiting across the parking lot when the shooting occurred. (*Id.* at pp. 619–620.) Third, the robbery was planned to occur after closing time, when

13

most of the store employees were gone, and the period of interaction between perpetrators and victims was designed to be limited. (*Id.* at pp. 620–621.) Fourth, because Clark was across the street from the scene, "[he] had no opportunity to observe anything in [the shooter's] actions just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence." (*Id.* at p. 621.) Finally, there was evidence Clark made some efforts to minimize the risks of violence, such as not loading the gun or loading it with only one bullet; however, the court determined Clark's subjective risk mitigation efforts did not necessarily foreclose an objective finding he acted with reckless indifference. (*Id.* at p. 622.) Turning to the objective facts, the court concluded that "there appear[ed] to be nothing in [Clark's] plan that one c[ould] point to that elevated the risk to human life beyond those risks inherent in any armed robbery," which is insufficient to show reckless indifference to human life. (*Id.* at p. 623.)

Most recently, in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), the California Supreme Court applied the *Banks* and *Clark* standard on reckless indifference to a resentencing petition filed under section 1172.6. After detailing the history of the major participant and reckless indifference standards, the Supreme Court held that the facts before it did not support a finding of reckless indifference, reversing the denial of resentencing. Specifically, the evidence showed Emanuel set out to commit a robbery in a public place in the middle of the afternoon. He was not armed and he did not know his confederate was armed or likely to use lethal force. The crime unfolded without a prolonged period of restraint. When met with unexpected resistance from the victim, Emanuel told his confederate, " 'let's go,' " and began

14

to walk away. (*Emanuel,* at p. 896.) The court concluded his conduct in fleeing the scene without rendering aid after the shooting was ambiguous; it could have reflected a lack of regard for the victim, a desire to avoid arrest, or both. (*Id.* at p. 893.) However, as the remaining factors weighed against a finding of reckless indifference, the court concluded that standing alone, the last factor was insufficient to demonstrate reckless indifference. (*Id.* at p. 891.)

## III.    Application of the Law to the Facts

### A.    Major Participant

Applying the law from these decisions and others to the facts from the evidentiary hearing in this case, we conclude the evidence here overwhelmingly supports a finding of reckless indifference.

### 1.    Use of or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing

There was evidence that Bloxton as well as another confederate was armed, one with an automatic handgun and one with a shotgun. Although Bloxton testified at the evidentiary hearing that he did not have a gun, the jury and the court found otherwise.[4] And Bloxton conceded that he knew that someone else involved in the robbery had a gun.

While there was no evidence in the record that Bloxton had knowledge of Bullard's likelihood of killing prior to participating in the robbery, the evidence is uncontested that he was informed

---

[4]    "The findings of the trial court upon conflicting evidence are conclusive." (*Emanuel, supra*, 17 Cal.5th at p. 885, fn. 7, citing *Wilbur v. Wilbur* (1925) 197 Cal. 1, 7.)

15

of Bullard's likely intention to kill someone while the robbery was in progress when Bullard said he was going to kill one of the victims because he was White. "A defendant's knowledge of a confederate's likelihood of using lethal force, which may be evident before or during the felony, is significant to the analysis of the defendant's mental state." (*In re Scoggins* (2020) 9 Cal.5th 667, 681 (*Scoggins*), citing *Clark, supra*, 63 Cal.4th at p. 621.)

### 2.     Duration of the Crime

There is no evidence of the specific length of time the robbery took from beginning to end, but the sequence of events shows that multiple people, including most consequentially Hoppes, were restrained for a significant period. "Courts have considered 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant' in analyzing the defendant's culpability." (*Scoggins, supra,* 9 Cal.5th at p. 680, quoting *Clark, supra*, 63 Cal.4th at p. 620.)

Initially, victim Bernal was approached while at a telephone at the gas station by a group of men, two of whom were armed with an automatic handgun and a shotgun. After one of the men took Bernal's property, the robbers moved him to the side of Bernal's Bronco and dragged his wife from the Bronco by her hair, taking her jewelry and money.

Around the same time, victim Laracuente also stopped with some friends at the same gas station to make a phone call. He and his friends were made to empty their pockets while standing alongside Bernal and his wife. A threat was made to kill all the Mexicans, and Laracuente was told that if he did not shut up he was going to get shot.

After all the money had been taken from those who were outside the cars, Bloxton and his confederates discovered Hoppes

16

in the back seat of Laracuente's car. They took Hoppes out of the car by force and beat him. Bullard said he was going to kill Hoppes because he was White. Bloxton said, "I don't care." After Hoppes was beaten, he began to run. While he was crossing the street, Bullard shot him in the leg. As Hoppes staggered to the sidewalk and collapsed, Bullard and Bloxton followed, and Bullard shot him. Then Bloxton and his confederates all fled.

From this summary it is apparent the robbery was significant enough in duration to have several different parts, first robbing the Bernal party and then the Laracuente party, including those who were making the phone calls and those who were waiting in the cars, removing them from the vehicles and holding them at gunpoint, including a threat to kill all the Mexicans, and another to shoot Laracuente. The crime did not stop there. It continued when Hoppes was spotted in the back seat of one of the cars, dragged out, and beaten; and when Bullard stated his intention to shoot Hoppes. At some point, Hoppes got up, ran across the street, and collapsed, with a shot fired as he was running, and more shots fired after his collapse.

Again, while Bloxton denied some of the above conduct at the evidentiary hearing, the trial court found his testimony was "belied" by the record. Indeed, some of Bloxton's testimony at the evidentiary hearing was also internally inconsistent: on the one hand, he testified he tried to stop Bullard from shooting both by saying "no, don't do it" and by running after him; on the other hand, he testified he did not know Bullard was going to shoot Hoppes.

Thus, in contrast to the facts in *Banks*, *Clark*, *Scoggins* and *Emanuel*, the shooting here was not simply a short encounter but a series of different events getting progressively more violent. It

included a period of restraint of the victims at gunpoint, with three threats to use violence over the course of the robbery.

### 3. Efforts Taken to Minimize the Risk of Violence

Contrasted with *Clark, Banks*, *Scoggins* and *Emanuel*, the record here does not reflect Bloxton made efforts either in advance or as the robbery progressed to minimize the risks of violence. (Cf. *Emanuel, supra*, 17 Cal.5th at p. 895 [Emanuel unarmed during robbery at a public park in the middle of the afternoon]; *Scoggins, supra,* 9 Cal.5th at p. 683 [Scoggins's plan was for a daytime confrontation in a public parking lot without the use of weapons]; *Clark, supra,* 63 Cal.4th at pp. 621–623 [Clark and his confederates waited until after a store was closed before they began their robbery of the store, there were not supposed to be any bullets in the gun, and the gun only had one bullet in it]; *Banks, supra*, 61 Cal.4th at p. 811 [no evidence Matthews knew there would be a guard present or that he would be armed].)

Here, the evidence shows that Bloxton was asked to join in a robbery shortly before it was to begin. There is no evidence he played any role in its planning. So while we cannot evaluate whether Bloxton attempted in advance to minimize the risks involved, the evidence shows that he willingly participated in a nighttime robbery at a little before 10:00 p.m. at a gas station. A gas station is a place open to the public, but the record is not clear as to how many people were, or were likely to be, present at the time of the incident. The jury also found that Bloxton was armed with a gun, as was Bullard. There was no evidence that either gun was only for show; in fact, multiple shots were fired and a number of shell casings and spent bullets were recovered.

18

### 4. Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims

Finally, it is uncontested that Bloxton was personally present during the entirety of the robbery, that he heard Bullard say he should kill Hoppes because Hoppes was White, and that Bloxton responded, "I don't care."[5]

The California Supreme Court could have been writing about this case when it held: " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*Emanuel, supra*, 17 Cal.5th at p. 889, quoting *Clark, supra,* 63 Cal.4th at p. 619.)

Bloxton was personally present and aware of the risk of impending lethal violence once Bullard announced his intention to shoot Hoppes and could have either aided Hoppes in fleeing or tried to restrain Bullard. (Cf. *Clark, supra,* 63 Cal.4th at p. 621

---

[5] While Bloxton testified during the evidentiary hearing that he did not mean "I don't care about him dying," he never explained what he *did* mean. Moreover, the trial court's finding on conflicting evidence is binding.

["Nor did defendant have an opportunity to observe [the shooter]'s response to [the victim's] unanticipated appearance or to intervene to prevent her killing."].) This weighs heavily in support of finding reckless indifference.

It is also uncontested that Bloxton followed Bullard in running after Hoppes (although Bloxton disputed why he ran) and that, after Bullard shot Hoppes, Bloxton ran away without aiding Hoppes. We assign little weight to these facts and consider them neutral, since they are ambiguous and could be interpreted merely as an attempt " 'to flee the scene as quickly as possible to avoid arrest, whether or not he understood the extent of [the victim's] injuries.' " (*Emanuel*, *supra*, 17 Cal.5th at p. 894.)

We decline to adopt either party's argument, made prior to the Supreme Court's analysis in *Emanuel*, about whether Bloxton took enough steps to prevent the shooting, or was in a position to have prevented the shooting. As the *Emanuel* court said: "The essential question underpinning our analysis is not whether [the nonshooter] did enough to stop [the killer's] unplanned act of violence; it is whether [the nonshooter] acted with the requisite mens rea, i.e., reckless indifference to human life. The focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state." (*Emanuel, supra*, 17 Cal.5th at p. 891.)

Thus, while a rapidly unfolding crime may not provide sufficient time to support a finding of reckless indifference, such a finding can be made even when the opportunity to do so is brief, in cases where the shooters "made their intentions clear, affording each defendant 'the time to observe and react before the murder.' " (*Emanuel, supra*, 17 Cal.5th at p. 892, quoting *In re Loza* (2017) 10 Cal.App.5th 38, 53.) Here, similar to *Loza* and *In*

*re McDowell* (2020) 55 Cal.App.5th 999, 1014, the shooter made his intention clear and Bloxton had an opportunity to say or do something to deescalate the situation. Instead, he made his indifference ("I don't care") clear.

### 5.    Bloxton's Age

Bloxton argues his age at the time of the crime, 18 or 19,[6] should also be considered as a factor in determining whether he acted with reckless indifference. This was mentioned only conclusorily at the evidentiary hearing, at which his attorney argued: "I believe [Bloxton] was 19 years old at the time of this incident. His youth is a factor." The age factor was not mentioned at all in Bloxton's evidentiary brief before the trial court, which focused appropriately on the factors in *Banks* and *Clark*.

While the California Supreme Court has not yet addressed this factor, some appellate courts have held that a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life. (*Emanuel, supra, supra,* 17 Cal.5th at p. 885, fn. 6, citing cases.) For example, in *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–417, the court acknowledged numerous appellate decisions treating a defendant's youth, defined roughly as 25 years or younger, as a factor within the totality of the circumstances relevant to the requisite mental state for felony murder. Those cases reason that, in light of our evolving understanding of adolescent brain development, "it is far from clear [whether a juvenile could be] actually aware 'of particular dangers posed by the nature of the

---

[6]    The record is conflicting on this point. While Bloxton testified that he was 19 at the time of the crime, his birthdate as recorded on other documents would indicate that he was 18.

crime, weapons used, or past experience or conduct of the other participants.' " (*People v. Harris* (2021) 60 Cal.App.5th 939, 960.)

On the other hand, the United States Supreme Court in *Tison* affirmed a death sentence for two brothers who were 19 and 20 at the time of a crime in which they were determined to be major participants acting with reckless indifference. (*Tison, supra*, 481 U.S. at pp. 142, 151–152, 158.)

Moreover, some courts have concluded that age is more appropriately considered in connection with the question of parole and when the individual should be released. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.) Indeed, that is what the trial court thought at the end of the evidentiary hearing here, after finding sufficient evidence of reckless indifference: "[T]he court was moved by Mr. Bloxton's description of his lifelong mental health challenges. Because of Mr. Bloxton's history of mental illness . . . , age at the time of the offense, and length of incarceration, the court invites him to file a petition for resentencing under . . . Section 1172.1."

We need not reach that issue here because, even assuming that age is a proper factor to be considered, it would be the only factor mitigating against a finding of reckless indifference. Given the overwhelming evidence of the necessary mens rea in this case, we would not find that consideration of Bloxton's age alone is strong enough to counter all the other factors discussed above.

### 6. The Totality of the Circumstances

In sum, all but one of the above factors weigh in favor of a finding of deliberate indifference. The factor of age—which has not yet been endorsed by our Supreme Court—is the only one that would weigh against a finding of reckless indifference. This is indeed the rare case in which the evidence supplies

information about the defendant's actual state of mind between the time that the killer stated his intent or plan to potentially kill the victim, and the time that the killing took place. Bloxton "d[id]n't care."

Bloxton claims this case is analogous to *People v. Underwood* (2024) 99 Cal.App.5th 303 (*Underwood*), but we disagree. While in both cases the nonkiller defendants only intended at the outset to participate in a robbery, not a murder, there are key differences. First, there was no evidence in *Underwood* that the nonkiller defendant (Underwood) knew that his confederate had a weapon (knife), and Underwood himself was unarmed. (*Id.* at p. 317.) Second, the duration of the incident was only "a few minutes" from the time Underwood and his confederate approached the victim to the time they fled. (*Id.* at p. 318.) The apparent commonality that Bloxton points to is that, despite Underwood's presence at the scene, the court found the absence of reckless indifference.

In *Underwood*, the nonkiller defendant (Underwood) told the police that when the killer threatened to kill the victim, Underwood tried to stop him, but stumbled and fell on his knees, failing to prevent the murder. (*Underwood, supra*, 99 Cal.App.5th at p. 310.)[7] As related to Underwood's presence at the murder, the court held: "Underwood was not present for a long sequence of events that culminated in murder. The mugging and stabbing unfolded within a few minutes—in a 'blink of an eye' according to [one witness] . . . . [¶] . . . [¶] . . . Considering the totality of the

---

[7] The Court of Appeal in *Underwood* noted that the trial court did not believe Underwood's testimony that he tried to stop the killer. (*Underwood, supra*, 99 Cal.App.5th at p. 315.)

circumstances, the evidence shows Underwood participated in a crime of opportunity that was spontaneous and happened quickly." (*Id.* at pp. 320–321.)

That is not this case. Without revisiting all the factors above, the crime at issue here was much more prolonged and included several periods of restraint. The killing of Hoppes did not occur in the "blink of an eye" but involved dragging him out of a car, beating him, Bullard proposing to kill Hoppes, and then Hoppes fleeing across the street. With at least three factors radically different, *Underwood* does not support reversal in this case.

## DISPOSITION

The order is affirmed.


RICHARDSON, J.


WE CONCUR:


LUI, P. J.


ASHMANN-GERST, J.


24